# Exhibit
# - 3 -

MORNINGSTAR | DBRS

# Rating Report
# Unison Trust 2024-1

**Morningstar DBRS**
June 5, 2024

**Contents**

1 Finalized Ratings
2 Transaction Spotlight
2 Rating Rationale
4 Morningstar DBRS Perspective
7 Contract Mechanics—Worked Example
9 UNSN 2024-1 Pool Contract Averages and Outliers
12 HEI Pool Summary
15 HEI Summary
16 Analysis
25 Securitization Trust Summary
31 Representations, Warranties, and Enforcement Mechanisms
33 Third-Party Due Diligence
34 Operational Risk Evaluation
41 Legal Final Maturity Date
41 Monitoring and Surveillance
41 Methodologies
42 Appendix A: Morningstar DBRS Analytical Tool
44 Appendix B: Morningstar DBRS Criteria: Approach to Environmental, Social, and Governance Risk Factors in Credit Ratings
46 Appendix C: Scope and Meaning of Financial Obligations



Derek Moran
+1 646 560-4561
derek.moran@morningstar.com

Mikhail Chernositov
+1 646 993-7752
mikhail.chernositov@morningstar.com.

Quincy Tang
+1 212 806-3256
quincy.tang@dbrsmorningstar.com


## Finalized Ratings (as of June 5, 2024)

| Class | Balance/Notional Amount ($) | Morningstar DBRS Rating | Legal Final Maturity Date | Cumulative Advance Rate (%) |
|---|---|---|---|---|
| Class A | 110,800,000 | BBB (sf) | April 2050 | 51.3 |
| Class B | 12,900,000 | BB (sf) | April 2050 | 57.3 |
| Certificates | n/a | NR | n/a | n/a |

NR = Not rated.

## Transaction Spotlight

| | | | |
|---|---|---|---|
| **Collateral** | 965 fixed home equity investment agreements secured by first, second, third, or fourth liens on residential properties with original terms to maturity of up to 30 years | **Issuer** | Unison Trust 2024-1 |
| **Initial Purchaser** | Nomura Securities International, Inc. | **Seller** | Odin New Horizon Real Estate Fund LP |
| **Offered Note Balance ($)** | 110,800,000 | **Indenture Trustee, Paying Agent, Note Registrar, Securities Intermediary, Certificate Registrar** | The Bank of New York Mellon Trust Company, N.A. |
| **Originators** | Unison Agreement Corp. and Unison Agreement AO Corp. | **Depositor** | Odin New Horizon Depositor LLC |
| **Asset Manager and Administrator** | Odin New Horizon Manager LLC | **Owner Trustee** | Wilmington Savings Fund Society, FSB |
| **Physical Custodian** | Deutsche Bank National Trust Company | **Electronic Custodian** | Deutsche Bank National Trust Company |
| **Backup Asset Manager (Backup Servicer)** | Servis One, Inc. doing business as BSI Financial Services, a Delaware corporation (BSI) | **Structure** | Senior/Subordinate |
| **Rated Note Balance ($)** | 123,700,000 | **Payments** | Sequential |
| **Closing Date** | June 5, 2024 | | |

.

## Rating Rationale

The Morningstar DBRS credit ratings address the ultimate payment of interest and full payment of principal by the legal final maturity date in accordance with the terms and conditions of the related Notes. Morningstar DBRS based the ratings primarily on the following:

- The transaction's capital structure and the form and sufficiency of available credit enhancement.
- Relevant credit enhancement in the form of subordination. Credit enhancement levels are sufficient to support the Morningstar DBRS-projected expected cumulative loss assumption under various stressed cash flow assumptions for the rated classes.
- The transaction's ability to withstand stressed cash flow assumptions and repay investors according to the terms of the transaction documents.
- The credit quality of the collateral and the Asset Manager's (Servicer's) ability to perform collection activities on the collateral pool.
- The legal structure and presence of legal opinions addressing the assignment of the assets to the Issuer and the consistency with the Morningstar DBRS *Legal Criteria for U.S. Structured Finance*.
- Morningstar DBRS' ratings on the Notes do not address statements regarding the likelihood or frequency of resolutions on the home equity investment (HEI) contracts, allocation of any interest shortfalls, or the likelihood that there may be interest shortfalls as a result of the occurrence of extraordinary trust expenses in any given month.

Morningstar DBRS finalized its provisional ratings on each class of notes by performing a quantitative and qualitative collateral, structural, and legal analysis. This analysis used the iterative Reverse Mortgage Analytical Tool developed for the purposes of rating this HEI transaction. The tool produced vectors based on contract-level information, and Morningstar DBRS subjected these vectors to a variety of stresses.

In this report, Morningstar DBRS used these vectors to show AAA, "A," and B rating cash flows for illustration purposes only (i.e., the rated notes in a transaction may not span this range). Morningstar DBRS assigned the ratings to each class based on the level of stresses each class could withstand and whether such stresses were commensurate with the applicable rating level. Morningstar DBRS' ratings do not consider any potential extraordinary expenses.

Morningstar DBRS performed operational risk reviews of the Originator, Asset Manager/Servicer, and Backup Servicer in the transaction. All of these parties were found to be acceptable, however, the Asset Manager/Servicer was deemed to only be acceptable with a backup servicer that is satisfactory to Morningstar DBRS.

A legal review of the transaction documents found no material concerns. Additionally, Morningstar DBRS and its legal counsel have conducted substantial legal reviews of the regulatory exposure of the HEI asset class and incorporated additional regulatory risk analytical adjustments in its analysis.

The above reviews are detailed in later sections of this report.

To analyze this transaction, Morningstar DBRS used its methodology entitled *Rating and Monitoring U.S. Reverse Mortgage Securitizations* (Appendix 3—Home Equity Investments[1] Methodology) published July 17, 2023. This is available at dbrs.morningstar.com.

For additional information on the meaning and scope of the financial obligations identified in this credit rating, please see Appendix C.

1. Also known as Home Equity Agreements (HEA) or Shared Equity Agreements.

**Morningstar DBRS Perspective**

**Home Equity Investments:** Originators in this sector variously use the terms Home Equity Agreements (HEA), HEI, and Shared Appreciation Agreements to describe their contracts. Morningstar DBRS uses these terms interchangeably, but per methodology, will frequently refer to the contracts as HEI in this document. HEIs allow homeowners access to the equity in their homes without the homeowners having to sell their homes or make monthly mortgage payments. HEIs provide homeowners with an alternative to borrowing and are available to homeowners of any age (unlike reverse mortgage loans, for example, for which there is often a minimum age requirement). A homeowner receives an upfront cash payment (an Investment Amount) in exchange for giving an Investor[2] (i.e., an Originator) a stake in their property. The homeowner retains sole right of occupancy of the property and pays all upkeep and expenses during the term of the HEI, but the Originator earns an investment return based on the future value of the property. Some HEI programs include a returns cap, but no caps exist in UNSN 2024-1.

Like reverse mortgage loans, the HEI underwriting approach is asset-based, meaning there is greater emphasis placed on the value of the underlying property and the amount of home equity than on the credit quality of the homeowner. The property value is the main focus for predicting investment return because it is the source of funds to satisfy the obligation. HEIs are nonrecourse; in a default situation a homeowner is not required to provide additional funds when the HEI settlement amount exceeds the remaining equity value in the property (after accounting for any other obligations such as senior liens, if applicable). Recovery of the Investment Amount and any Originator return is subject to the amount of appreciation/depreciation on the property, the amount of debt that may be senior to the HEI, and the cap on investor return, if applicable.

Contract settlement is required upon events such as (1) transfer of the HEI's title such as if the homeowner sells the related residence; (2) repayment of the HEI by the homeowner typically to take advantage of lower market interest rates or to access additional home equity (a Refinance Event); or (3) the Option Agreement reaching the Stated Maturity date (Term Event). In certain circumstances settlement may also result from the homeowner (A) failing to pay certain expenses (e.g., senior mortgage loans, property taxes, or homeowner’s insurance premiums), (B) failing to maintain the home, (C) declaring voluntary or involuntary bankruptcy, or (D) other defaults under the HEI agreement (each a Default Event); (4) death of the last remaining signatory, unless the estate or heirs choose to keep the property, in which case the contract can survive.

HEIs are typically structured as nonrecourse real estate option contracts, or nonrecourse forward sale contracts, which grant the Originator the right to purchase a percentage interest in the future value or future price of the related property at a stated price.

2. To disambiguate between Bond Investors and Contract Investors (Originators) in this report any reference to the term Investor means Originators, that is, Contract Investors. A Bond Investor will always be referred to by the term Bond Investor.

The collateral has approximately $215.9 million in exercise value from 965 nonrecourse HEI agreements secured by first, second, third, or fourth liens on single-family, multifamily (two- to four-family), condominium, planned unit developments, and attached properties. All of the contracts in the asset pool were originated between 2017 and 2019.

As of the cut-off date, 61 contracts in the transaction are first-lien contracts, representing roughly $5.91 million in original investment payment; 773 are second-lien contracts, representing roughly $62.55 million in original investment payment; 123 are third-lien contracts, representing roughly $12.36 million in original investment payment; and eight are fourth-lien contracts, representing roughly $0.71 million in original investment payment.

Of the pool, 7.25% of the contracts by original investment amount are first lien and have a weighted-average original sensitivity ratio[3] of 3.97, 76.73% are second-lien contracts and have a weighted-average original sensitivity ratio of 3.95, 15.16% of the pool are third-lien contracts with a weighted-average original sensitivity ratio of 3.99, and the remaining 0.87% of the pool are fourth-lien contracts and have a weighted-average original sensitivity ratio of 4.00. This brings the entire transaction's weighted-average sensitivity ratio to 3.96. To better understand the impact and mechanics of sensitivity ratio, please see the example below, in the Contract Mechanics—Worked Example section. The current unadjusted loan-to-value ratio (LTV) of the pool is 39.96% (i.e., of senior liens ahead of the contracts). At cut-off, the pool had a weighted-average original option-to-value (OTV) of 15.23%, and a weighted-average original loan-plus-option-to-value (LOTV) of 71.23%.

**Transaction Structure:** The transaction uses a sequential structure in which cash distributions are first made to reduce the Interest Amount and Cap Carryover Amount on Class A Notes. Payments are then made to the Note Amount of Class A Notes until such notes reduced to zero followed by payments to reduce the Additional Accrued Amounts for the Class A Notes that accrued on any earlier payment date but have not been paid until the Additional Accrued Amounts are reduced to zero. The Class B Notes are full accrual notes and will not be entitled to receive any payments of principal until the Class A Notes and Class A Additional Accrued Amounts have been paid in full. Payments will not be made to the Class B Notes unless and until an Optional Redemption, Clean-Up Call, Auction Proceeds Redemption, or Indenture Default. Upon an Optional Redemption, Clean-Up Call, Auction Proceeds Redemption, or Indenture Default, payments are made to the aggregate Note Amount on the outstanding Notes.

**Loss Drivers:** When determining losses for HEI contracts, Morningstar DBRS considers home price index (HPI) projections, contract terms, and the presence of senior liens. The effect of the projected home price on the contract value, and the resulting value after senior liens are repaid is paramount to the loss analysis. Projected losses are generally higher on contracts with properties in regions that have experienced greater home price declines than national averages.

3. Sensitivity ratios at origin calculated as Investor Percentage/(Investment Payment/Original Agreed Value). Sensitivity ratios as of any date of measurement are calculated as Investor Percentage/(Option Exercise Value/Updated Valuation as of such date).

**Defaults:** The biggest drivers of defaults for UNSN 2024-1 were current OTV and LOTV projections, which are a function of the HPI projections. Morningstar DBRS uses a default probability distribution that resembles a PSA-style ramp typically with different rise rates and ultimate plateaus for B, "A," and AAA, respectively.

**Voluntary Prepayment Rate:** Morningstar DBRS used a prepayment ramp (details in the Analysis section below). Morningstar DBRS scales these baseline curves depending on homeowner age.

**Death:** Morningstar DBRS models death probability using standard Social Security tables by gender and age. In cases where the contract has two signatories, both signatories need to have been modeled with maturity events or the contract remains active. Death events with LOTVs lower than 90% were modeled to result in a property sale after a six-month lag, whereas if the LOTV is greater than 90%, these contracts are subjected to liquidation and real estate owned (REO) timelines, with associated costs.

In addition, Morningstar DBRS stresses "A" and AAA life expectancy by lowering the death probability in each rating scenario, which acts to delay mortality events and associated cash flow. Morningstar DBRS expects foreclosure timelines to be shorter than for forward mortgages where the homeowner may contest the process.

**Geographic Concentration:** The majority of the contracts in the pool are originated in California (52.87%), Maryland (5.17%), and New Jersey (5.16%) based on investment amount.

The geographic concentration risk is mitigated by the appropriate handling of the respective geographic locations of the contracts within the Morningstar DBRS Analytical Tool. The tool accounts for price projections at the ZIP code or regional level.

**Home Price Value Adjustment:** Morningstar DBRS applied a haircut to the valuations provided to account for the timing of the valuation and valuation method. Morningstar DBRS applied a 5% haircut to recent appraisals (done at most 18 months prior to the cut-off date) and a 10% haircut to more dated appraisals. An additional 5% haircut is also applied to any property with a valuation of $5 million or more.

**Contract Value Adjustment:** As detailed in the discussion below, the contracts are very sensitive to our home price decline stresses. The HEI contracts (of certain issuers) perform extremely well in the flat home value profile of the B stress scenario, and if this is the case, Morningstar DBRS considers additional stress haircuts to mute the B scenario upside somewhat. In the case of UNSN 2024-1, Morningstar DBRS applied no such haircuts beyond the above-mentioned valuation adjustments.

**Originator:** Morningstar DBRS performed an onsite operational risk review of the originator and believes the company is an acceptable HEI originator.

**Backup Asset Manager and Administrator:** Servis One, Inc. (Servis) doing business as (dba) BSI Financial Services (BSI) is the backup asset manager (backup servicer) in this transaction. Morningstar DBRS performed an operational risk review of BSI's servicing operations and believes that the company is an acceptable loan servicer for Morningstar DBRS-rated transactions and an acceptable backup asset manager for HEI contracts. As a result, Morningstar DBRS did not adjust its loss projections.

**Due Diligence:** The contracts backing the UNSN 2024-1 transaction have undergone a third-party due-diligence review. Morningstar DBRS assumed the data provided was accurate and fully reflected the results of the due-diligence review.

**Risk Retention:** Typically, the sponsor or a majority-owned affiliate of the sponsor will retain a vertical/horizontal residual interest of at least 5% of the fair value of the notes, including mezzanine and/or interest-only notes, to satisfy credit risk-retention rules. To the extent the sponsor retains such interest, this creates an alignment of interests between the sponsor and the bond investors because, by holding the first-loss piece, the sponsor is incentivized to minimize collateral losses.

For UNSN 2024-1, however, the Seller has determined that it is not required to retain credit risk under the U.S. Risk Retention requirements for asset-backed securities in connection with this transaction because the Options are not "self-liquidating assets" and thus the Notes are not "asset-backed securities" or a "securitization transaction" as defined in the Securities Exchange Act of 1934 and rules and regulations thereunder.

### Contract Mechanics—Worked Example

Each Option is an investment in the related Optioned Property. The Investment Payment is specified in the Option Agreement and made to the Homeowner in partial consideration for granting the Option to the Option Agreement Owner. Each Option gives the Option Agreement Owner the right, upon certain Option Exercise events (and prior to a Special Termination), to purchase an undivided percentage ownership interest in and to the related Optioned Property. As a consequence of the contractual terms, the owner of the Option will be entitled to a share of the Optioned Property's appreciation (or will bear a limited share of any depreciation up to the amount of the Investment Payment) and the potential return (or credit against its exercise price) of an Investment Payment made by the Originator at the time of origination of the Option.

An example is provided below to illustrate the mechanics of this arrangement. Here, the investor pays the homeowner $100,000 in exchange, nominally, for a leveraged stake in future home appreciation.

| **Origination Data** | |
|---|---|
| Underwritten Home Value (Original Agreed Value) | $1,000,000 |
| Initial Investment Amount (Original Investment Price) | $100,000 |
| OTV (Option to Value, i.e., Investment as Percent of Property) | 10% |
| Senior Liens | 0% (ignored in this example) |
| OLTV (Option plus Loan to Value) | 10% (10% + senior liens) |
| Pricing Ratio[4] | 4x |
| Investor Percentage | 40% (OTV x Pricing Ratio = 10% x 4) |
| Lockout period | 3 years |
| Returns Cap | None |
| Investment Age | 0.0 Years |

During the lockout period, the contract precludes the homeowner from paying off the contact for less than the initial investment amount. Absent this lockout stipulation, the Repayment Amount is

- Initial Investment + Investor Percentage * (Ending Agreed Value - Original Agreed Value)

Note that this stake is uncapped (and symmetrically is not floored, aside from potentially being crowded out by the senior liens, or intrinsically being worth zero) meaning the return on investment is a linear function of the increase or decrease in house prices.

The future value of the contract if the home is sold after 10 years for $1,200,000 (20% appreciation), would be Initial Investment + Investor Percentage * (Current Value - Starting Value) = $100,000 + 40% x ($1,200,000 - $1,000,000) = $180,000.

Conversely, the value of the contract if the home is sold after 10 years for $800,000 (20% depreciation), would be Initial Investment + Investor Percentage * (Current Value - Starting Value) = $100,000 + 40% x ($800,000 - $1,000,000) = $20,000. If during the lockout period (three years in this case) the home sells for less than the initial agreed upon value, Unison would not share in the loss with the homeowner, so the contract would reclaim the invested $100,000.

The charts below further highlight the mechanics in this simplified example. If home prices stay flat, (see Ending Agreed (Contract) Value—Flat Home Prices chart), the contract value would also stay flat (i.e., Unison gets its initial investment back in full). If home prices decline by 20% over 36 months (as illustrated in the Ending Agreed (Contract) Value—Home Prices Decline 20% graph), the contract value would decline by 80% to $20,000, which reflects the 40% stake in the decline of the new $800,000 home valuation.

4. This number is derived backwards from the maximum investor share of 70% divided by the 4x multiple used for most contracts. The maximum investor's share in the change in property value is 70% because the intent is that the homeowner will always maintain a minimum interest in the future change in value. The 4x multiple for the investor's share (i.e., 10% of the current property value "buys" 40% change in value) is the market clearing number between investor and homeowner for the HomeOwner product. Non-owner-occupied properties have a higher risk, hence the 5x multiple for those properties.

**Illustrative Value Paths for an Example Unison Contract**




Source: Morningstar DBRS.

## UNSN 2024-1 Pool Contract Averages and Outliers

In the charts below, the solid lines indicate the averages (i.e., 50th percentile). The dotted blue and dashed cyan-colored lines show the minimum contract value vectors (i.e., the contracts with the lowest trajectories in the pool, specifically the 5th and 25th percentiles, respectively). Usually, lower-performing contracts are those running into a large senior-lien load. The dashed bright green and dotted, green-colored lines show the maxima (i.e., the highest-performing contract(s) in terms of growth in value relative to cut-off, specifically the 75th and 95th percentile, respectively), and these are typically low OTV contracts where no senior liens exist. Note these idealized and simplified contract value vectors ignore lockouts. For more discussion of these shapes, please see Discussion—Contract Values in the Analysis section below.

**Illustrative Value Paths for Unison Contracts**

**Contract Values—Flat Home Prices**




**Contract Values—"A" Scenario Home Prices**




Source: Morningstar DBRS.

The best-performing contracts (95th percentile) have OTVs around 15% and have experienced very favorable home price appreciation. In the "A" scenario these contracts are experiencing 20% to 22% home price declines (after relief as discussed in the RRAA section) but are protected by their locked-in home price appreciation.

The contracts most vulnerable to downside (below 5th percentile) typically have larger senior liens, LOTVs around 65% to 75%, and are in zip codes that are modeled to experience more severe home price declines. In the "A" scenario these contracts are experiencing 35% to 40% home price declines.

Note that the average Contract Values shown in the "A" scenario charts above and below (solid red line) show contracts losing over half their value, but do not go to zero. This would appear to contradict what is shown earlier in the Illustrative Value Paths for an Example Unison Contract group, specifically the blue line in the right-hand chart showing Home Prices Decline 20%, where a 20% decline, magnified by the 4.0x pricing ratio results in an 80% value loss. This difference can be explained by the fact that the real contracts have embedded some gains already, whereas the Example contract is shown to lose value immediately, so is less protected.

## Contract Illustrations for UNSN 2024-1

### Unweighted Average in Various Scenarios




### Return on Investment of Contracts by Termination Period




Source: Morningstar DBRS.

## HEI Pool Summary[5]

| Geographic Distribution (Top 15 States) | Number of Options | Aggregate Investment Amount ($) | Aggregate Investment Amount (%) | Aggregate Exercise Value ($) | Aggregate Exercise Value (%) | Aggregate Updated Valuation ($) | WA Original OTV (%) | WA Current LTV (%) | WA Investor Percentage (%) | WA Investment age |
|---|---|---|---|---|---|---|---|---|---|---|
| California | 402 | 43,107,557.20 | 52.87 | 113,002,086.77 | 52.34 | 428,223,688.00 | 15.07 | 38.90 | 59.68 | 67 |
| Maryland | 52 | 4,211,896.00 | 5.17 | 9,192,668.69 | 4.26 | 36,155,147.00 | 15.53 | 48.31 | 61.31 | 67 |
| New Jersey | 48 | 4,203,044.00 | 5.16 | 11,581,333.83 | 5.36 | 41,303,193.00 | 15.35 | 41.64 | 60.70 | 67 |
| New York | 38 | 4,116,440.00 | 5.05 | 7,669,460.53 | 3.55 | 34,072,832.00 | 15.43 | 41.00 | 60.84 | 67 |
| Washington | 48 | 3,633,505.00 | 4.46 | 10,604,774.08 | 4.91 | 37,633,120.00 | 15.25 | 39.69 | 60.70 | 66 |
| Florida | 58 | 3,072,024.00 | 3.77 | 11,516,119.90 | 5.33 | 34,265,647.00 | 15.71 | 32.03 | 62.58 | 64 |
| Illinois | 37 | 2,479,859.50 | 3.04 | 5,712,203.90 | 2.65 | 21,357,273.00 | 15.98 | 41.57 | 62.41 | 65 |
| Colorado | 41 | 2,424,504.00 | 2.97 | 6,473,257.02 | 3.00 | 24,502,209.00 | 14.50 | 39.97 | 57.99 | 64 |
| Arizona | 34 | 1,785,770.00 | 2.19 | 6,572,292.23 | 3.04 | 19,996,395.00 | 15.34 | 39.21 | 61.11 | 67 |
| Massachusetts | 25 | 1,740,627.00 | 2.13 | 4,972,399.13 | 2.30 | 17,123,360.00 | 15.64 | 36.39 | 62.33 | 65 |
| Pennsylvania | 34 | 1,686,889.00 | 2.07 | 4,756,464.74 | 2.20 | 15,441,600.00 | 16.21 | 41.80 | 64.53 | 66 |
| Oregon | 27 | 1,570,657.00 | 1.93 | 3,927,193.33 | 1.82 | 14,483,678.00 | 15.48 | 44.96 | 61.94 | 65 |
| Nevada | 25 | 1,376,054.00 | 1.69 | 3,774,482.16 | 1.75 | 12,363,565.00 | 16.31 | 36.36 | 65.45 | 64 |
| Virginia | 19 | 1,367,171.00 | 1.68 | 3,640,231.70 | 1.69 | 13,221,910.00 | 15.38 | 40.07 | 60.68 | 68 |
| Connecticut | 11 | 1,269,150.00 | 1.56 | 3,193,009.61 | 1.48 | 16,429,911.00 | 11.68 | 43.47 | 43.58 | 67 |
| Other | 66 | 3,484,600.50 | 4.27 | 9,304,886.94 | 4.31 | 31,774,033.00 | 16.07 | 45.04 | 63.69 | 64 |
| **Total:** | **965** | **81,529,748.20** | **100.00** | **215,892,864.56** | **100.00** | **798,347,561.00** | **15.23** | **39.96** | **60.33** | **66** |

| Occupancy Type | Number of Options | Aggregate Investment Amount ($) | Aggregate Investment Amount (%) | Aggregate Exercise Value ($) | Aggregate Exercise Value (%) | Aggregate Updated Valuation ($) | WA Original OTV (%) | WA Current LTV (%) | WA Investor Percent (%) | WA Investment Age |
|---|---|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 964 | 81,492,648.20 | 99.95 | 215,769,351.66 | 99.94 | 798,012,114.00 | 15.23 | 39.97 | 60.33 | 66 |
| Non-Owner Occupied | 1 | 37,100.00 | 0.05 | 123,512.90 | 0.06 | 335,447.00 | 17.50 | 26.31 | 70.00 | 69 |
| **Total:** | **965** | **81,529,748.20** | **100.00** | **215,892,864.56** | **100.00** | **798,347,561.00** | **15.23** | **39.96** | **60.33** | **66** |

| Property Type | Number of Options | Aggregate Investment Amount ($) | Aggregate Investment Amount (%) | Aggregate Exercise Value ($) | Aggregate Exercise Value (%) | Aggregate Updated Valuation ($) | WA OTV (%) | WA Current LTV (%) | WA Investor Percent (%) | WA Investment Age |
|---|---|---|---|---|---|---|---|---|---|---|
| Single-Family Residence | 640 | 54,360,396.70 | 66.68 | 142,339,631.77 | 65.93 | 532,848,346.00 | 15.18 | 39.70 | 60.15 | 66 |
| Planned Unit Development | 252 | 20,517,532.50 | 25.17 | 59,447,302.17 | 27.54 | 208,699,007.00 | 15.27 | 41.42 | 60.49 | 66 |
| Condominium | 63 | 5,328,019.00 | 6.54 | 11,445,794.23 | 5.30 | 45,202,939.00 | 15.81 | 37.86 | 62.17 | 66 |
| Multifamily | 5 | 850,250.00 | 1.04 | 1,805,287.18 | 0.84 | 7,597,541.00 | 14.55 | 30.32 | 58.20 | 69 |
| Attached | 5 | 473,550.00 | 0.58 | 854,849.21 | 0.40 | 3,999,728.00 | 14.83 | 46.90 | 57.60 | 65 |
| **Total:** | **965** | **81,529,748.20** | **100.00** | **215,892,864.56** | **100.00** | **798,347,561.00** | **15.23** | **39.96** | **60.33** | **66** |

5. The percentage numbers in these tables are weighed by original investment Payment

| Range of Investment Payment ($) | Number of Options | Aggregate Investment Amount ($) | Aggregate Investment Amount (%) | Aggregate Exercise Value ($) | Aggregate Exercise Value (%) | Aggregate Updated Valuation ($) | WA OTV (%) | WA Current LTV (%) | WA Investor Percent (%) | WA Investment Age |
|---|---|---|---|---|---|---|---|---|---|---|
| 10,000.01 - 20,000.00 | 10 | 189,150.00 | 0.23 | 631,310.68 | 0.29 | 3,534,744.00 | 9.13 | 38.27 | 35.98 | 66 |
| 20,000.01 - 30,000.00 | 59 | 1,590,048.00 | 1.95 | 5,096,818.36 | 2.36 | 21,347,898.00 | 12.60 | 38.47 | 50.30 | 66 |
| 30,000.01 - 40,000.00 | 95 | 3,450,371.00 | 4.23 | 11,011,456.80 | 5.10 | 41,068,452.00 | 14.25 | 37.46 | 56.61 | 65 |
| 40,000.01 - 50,000.00 | 140 | 6,393,044.00 | 7.84 | 18,574,083.45 | 8.60 | 68,144,169.00 | 14.63 | 39.46 | 58.23 | 66 |
| 50,000.01 - 60,000.00 | 132 | 7,325,837.00 | 8.99 | 21,599,529.39 | 10.00 | 79,008,987.00 | 14.73 | 42.84 | 58.59 | 66 |
| 60,000.01 - 70,000.00 | 93 | 6,093,838.00 | 7.47 | 17,056,307.05 | 7.90 | 61,036,948.00 | 15.11 | 44.42 | 59.75 | 66 |
| 70,000.01 - 80,000.00 | 75 | 5,701,162.50 | 6.99 | 16,213,803.57 | 7.51 | 59,133,585.00 | 14.91 | 41.43 | 59.28 | 66 |
| 80,000.01 - 90,000.00 | 63 | 5,381,112.50 | 6.60 | 14,283,886.99 | 6.62 | 52,417,029.00 | 15.25 | 43.27 | 60.63 | 67 |
| 90,000.01 - 100,000.00 | 63 | 6,077,929.00 | 7.45 | 16,599,708.56 | 7.69 | 59,479,090.00 | 15.29 | 39.12 | 60.57 | 67 |
| 100,000.01 - 200,000.00 | 183 | 24,534,174.20 | 30.09 | 61,755,897.24 | 28.60 | 228,164,447.00 | 15.58 | 41.48 | 61.44 | 67 |
| 200,000.01 - 300,000.00 | 37 | 8,653,306.00 | 10.61 | 20,492,662.35 | 9.49 | 74,414,554.00 | 16.00 | 36.07 | 63.21 | 66 |
| 300,000.01 - 400,000.00 | 7 | 2,404,050.00 | 2.95 | 6,604,179.87 | 3.06 | 21,884,958.00 | 16.58 | 29.40 | 64.99 | 68 |
| 400,000.01 - 500,000.00 | 8 | 3,735,726.00 | 4.58 | 5,973,220.25 | 2.77 | 28,712,700.00 | 15.26 | 31.12 | 61.04 | 65 |
| **Total:** | **965** | **81,529,748.20** | **100.00** | **215,892,864.56** | **100.00** | **798,347,561.00** | **15.23** | **39.96** | **60.33** | **66** |

| Lien Position | Number of Options | Aggregate Investment Amount ($) | Aggregate Investment Amount (%) | Aggregate Exercise Value ($) | Aggregate Exercise Value (%) | Aggregate Updated Valuation ($) | WA OTV (%) | WA Current LTV (%) | WA Investor Percent (%) | WA Investment Age |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 61 | 5,910,401.00 | 7.25 | 15,391,005.34 | 7.13 | 54,757,042.00 | 15.93 | 22.10 | 63.17 | 65 |
| 2 | 773 | 62,554,951.70 | 76.73 | 167,487,292.29 | 77.58 | 615,911,951.00 | 15.22 | 41.70 | 60.16 | 66 |
| 3 | 123 | 12,358,790.50 | 15.16 | 30,985,530.01 | 14.35 | 120,160,608.00 | 15.00 | 39.79 | 59.86 | 66 |
| 4 | 8 | 705,605.00 | 0.87 | 2,029,036.92 | 0.94 | 7,517,960.00 | 15.03 | 38.61 | 60.10 | 64 |
| **Total:** | **965** | **81,529,748.20** | **100.00** | **215,892,864.56** | **100.00** | **798,347,561.00** | **15.23** | **39.96** | **60.33** | **66** |

| Range of Investment Age (Months) | Number of Options | Aggregate Investment Amount ($) | Aggregate Investment Amount (%) | Aggregate Exercise Value ($) | Aggregate Exercise Value (%) | Aggregate Updated Valuation ($) | WA OTV (%) | WA Current LTV (%) | WA Investor Percent (%) | WA Investment Age |
|---|---|---|---|---|---|---|---|---|---|---|
| 60 - 71 | 849 | 70,596,957.20 | 86.59 | 185,291,041.03 | 85.83 | 689,251,696.00 | 15.20 | 39.75 | 60.30 | 65 |
| 72 - 83 | 113 | 10,568,341.00 | 12.96 | 29,560,014.33 | 13.69 | 104,567,012.00 | 15.50 | 41.34 | 60.85 | 75 |
| 84 - 90 | 3 | 364,450.00 | 0.45 | 1,041,809.20 | 0.48 | 4,528,853.00 | 13.49 | 39.87 | 51.30 | 85 |
| **Total:** | **965** | **81,529,748.20** | **100.00** | **215,892,864.56** | **100.00** | **798,347,561.00** | **15.23** | **39.96** | **60.33** | **66** |

| Remaining Option Term (Months) | Number of Options | Aggregate Investment Amount ($) | Aggregate Investment Amount (%) | Aggregate Exercise Value ($) | Aggregate Exercise Value (%) | Aggregate Updated Valuation ($) | WA OTV (%) | WA Current LTV (%) | WA Investor Percent (%) | WA Investment Age (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| 263 - 274 | 1 | 169,750.00 | 0.21 | 396,171.30 | 0.18 | 1,293,459.00 | 17.50 | 29.63 | 70.00 | 86 |
| 275 - 286 | 76 | 7,011,065.00 | 8.60 | 19,531,139.19 | 9.05 | 71,594,337.00 | 15.08 | 42.05 | 59.19 | 77 |
| 287 - 298 | 730 | 60,577,593.20 | 74.30 | 159,451,311.67 | 73.86 | 593,956,849.00 | 15.20 | 40.15 | 60.29 | 66 |
| 299 - 310 | 158 | 13,771,340.00 | 16.89 | 36,514,242.40 | 16.91 | 131,502,916.00 | 15.43 | 38.20 | 60.98 | 61 |
| **Total:** | **965** | **81,529,748.20** | **100.00** | **215,892,864.56** | **100.00** | **798,347,561.00** | **15.23** | **39.96** | **60.33** | **66** |

| Performing Status | Number of Options | Aggregate Investment Amount ($) | Aggregate Investment Amount (%) | Aggregate Exercise Value ($) | Aggregate Exercise Value (%) | Aggregate Updated Valuation ($) | WA OTV (%) | WA Current LTV (%) | WA Investor Percent (%) | WA Investment Age |
|---|---|---|---|---|---|---|---|---|---|---|
| Performing Under Contract's Terms | 938 | 77,831,928.20 | 95.46 | 207,420,807.59 | 96.08 | 765,932,498.00 | 15.20 | 40.26 | 60.17 | 66 |
| Tax Delinquency | 15 | 2,656,458.00 | 3.26 | 6,049,657.13 | 2.80 | 22,697,148.00 | 16.24 | 26.83 | 64.68 | 67 |
| 30 Days Delinquent under Senior Loan | 9 | 779,237.00 | 0.96 | 1,598,861.61 | 0.74 | 6,707,931.00 | 16.04 | 52.63 | 64.15 | 64 |
| 60 Days Delinquent under Senior Loan | 3 | 262,125.00 | 0.32 | 823,538.23 | 0.38 | 3,009,984.00 | 13.91 | 44.98 | 53.93 | 70 |
| **Total:** | **965** | **81,529,748.20** | **100.00** | **215,892,864.56** | **100.00** | **798,347,561.00** | **15.23** | **39.96** | **60.33** | **66** |

## HEI Summary

| | UNSN 2024-1 | | | UNSN 2023-2 | | |
|---|---|---|---|---|---|---|
| | **Range or Total** | **WA/Average (as indicated)**[1] | **Total Percentage**[1] | **Range or Total** | **WA/Average (as indicated)**[1] | **Total Percentage**[1] |
| Number of Options | 965 | — | — | 1,023 | — | — |
| Aggregate Investment Payment | $81,529,748 | — | — | $93,210,167 | — | — |
| Investment Payment | $16,6500 to $500,000 | $84,487[2] | | $21,000 to $500,000 | $91,1152[2] | |
| Aggregate Exercise Value[3] | $215,892,865 | — | — | $202,460,853.10 | — | — |
| Exercise Value[3] | $11,186.40 to $1,560,264.77 | $223,723[2] | — | $47,288.43 to $1,127,045.40 | $197,909[2] | — |
| Investor Percentage | 20.00% to 70.00% | 60.33% | — | 20.00% to 70.00% | 63.04% | — |
| Original Pricing Sensitivity Ratio[4] | 3.50x to 4.50x | 3.96x | — | 3.30x to 5.00x | 3.97x | — |
| Current Pricing Sensitivity Ratio[5] | 1.47x to 11.77x | 2.30x | — | 1.66x to 3.98x | 2.35x | — |
| Cumulative HPA Experienced | -3.55% to 16.50%[6] | 6.35%[6] | | -13.00% to 32.48%[6] | 8.64%[6] | |
| Homeowner Credit Score at Origination[7] | 637 to 850 | 736 | — | 620 to 850 | 742 | — |
| Current Age of Homeowners[8] | 29 to 100 | 61 | — | 24 to 95 | 59 | — |
| Original OTV Ratio[9] | 5.00% to 20.00% | 15.23% | — | 5.00% to 21.00% | 15.50% | — |
| Original LTV Ratio[10] | 0.00% to 85.00% | 56.00% | — | 0.00% to 83.22% | 56.27% | — |
| Current LTV Ratio[11] | 0.00% to 80.33% | 39.96% | — | 0.00% to 73.83% | 40.42% | — |
| **Option Term (months)** | | | | | | |
| 360 | $81,529,748 | — | 100.00% | $93,210,167 | — | 100.00% |
| **Current Lien Position** | | | | | | |
| 1st | $5,910,401 | — | 7.25% | $3,806,973 | — | 4.08% |
| 2nd | $62,554,952 | — | 76.73% | $72,036,295 | — | 77.28% |
| 3rd | $12,358,791 | — | 15.16% | $17,248,369 | — | 18.50% |
| 4th | $705,605 | — | 0.87% | $118,530 | — | 0.13% |
| **Occupancy Type** | | | | | | |
| Owner-Occupied | $81,492,648 | — | 99.95% | $92,706,377 | — | 99.46% |
| Non-Owner Occupied | $37,100 | — | 0.05% | $503,790 | — | 0.54% |
| Option Age (months) | 60 to 86 | 66 | — | 14 to 52 | 39 | — |
| **Geographic Distribution in Excess of 5.00% of the aggregate Investment Payment** | | | | | | |
| **Rank** | **State** | **Range or Total** | **Total Percentage**[1] | **State** | **Range or Total** | **Total Percentage**[1] |
| 1. | California | $43,107,557 | 52.87% | California | $38,851,684 | 41.68% |
| 2. | Maryland | $4,211,896 | 5.17% | Florida | $7,756,668 | 8.32% |
| 3. | New Jersey | $4,203,044 | 5.16% | New York | $6,661,506 | 7.15% |
| 4. | New York | $4,116,440 | 5.05% | New Jersey | $5,920,513 | 6.35% |
| 5. | n/a | — | — | Colorado | $5,771,000 | 6.19% |
| 6. | n/a | — | — | Virginia | $4,747,293 | 5.09% |

1. All weighted averages are weighted by the Original Investment Payment.
2. Based on average instead of weighted average.
3. Based on Updated Valuations as of March 31, 2024.
4. Original Pricing Sensitivity Ratio calculated at origination as: Investor Percentage / (Investment Payment / Original Agreed Value).
5. Current Pricing Sensitivity Ratio calculated as of the Cut-Off Date as: Investor Percentage / (Option Exercise Value / Updated Valuation as of the Cut-Off Date).
6. Annualized figure; calculated as (Updated Valuation as of Cut-Off Date / Original Agreed Value) ^ (1 / (Years from the Effective Date to the Cut-Off Date)) -1, where years is calculated on a 30/360 basis.
7. For Options that originated on or before April 30, 2020, the qualifying FICO used as part of Unison's underwriting process is the lower mid-FICO of all applicants whose income was used for qualification purposes. For Options that originated on or after May 1, 2020, the qualifying FICO used as part of Unison's underwriting process is the higher mid-FICO of all applicants whose income was used for qualification purposes.
8. Calculated using the age of the primary applicant as of the Cut-Off Date.
9. Calculated as the Investment Payment of the Option divided by the Original Agreed Value.
10. Calculated as the total debt secured by the Optioned Property (i.e., the outstanding balance of liens secured by the Optioned Property, including any unused portion of committed credit lines, and excluding the Investment Payment of the Option) at origination divided by the Original Agreed Value.
11. Calculated as the total debt secured by the Optioned Property (i.e., the outstanding balance of liens secured by the Optioned Property, including any unused portion of committed credit lines, and excluding the Investment Payment of the Option) at origination divided by the Updated Valuation.

## Analysis

### Interest Rate Assumptions

Morningstar DBRS typically stresses interest rates at every rating level to account for the uncertainty of future interest rates; however, HEI contract values are not directly affected by interest rates. Instead, the influence of interest rate fluctuations may affect refinance rates or house prices in general. The current Morningstar DBRS methodology does not factor these interest rate projections into Morningstar DBRS' prepayment analysis because the historical data show prepayment rates for HEIs are related more to home price trajectories than interest rates.

### HPI Analysis

In the "A" rating scenario, Morningstar DBRS applies house price decline assumptions that are at least as stressful as the worst house price decline experienced by that specific region since 1976. If the regional declines have been less severe than the national average HPI decline, Morningstar DBRS uses the national average HPI decline for the region as a conservative assumption.

Because a security rated AAA should survive an extremely stressful environment, Morningstar DBRS applies an economic scenario equivalent to a catastrophic event when running a AAA rating scenario. To simulate this scenario, Morningstar DBRS applies a house price decline that is more severe than the "A" house price decline. For example, at the time of this publication, the AAA house price decline assumption is generally 30% more severe than the "A" decline. HPI forecast assumptions are regional, so deal-level HPI assumptions will vary based on the pool's geographic composition.

As a result, the Morningstar DBRS Reverse Mortgage Analytical Tool generally does not need out-of-model adjustments for geographic compositions. The chart below displays the magnitude of the Morningstar DBRS HPI stress for UNSN 2024-1. The line labeled History tracks the actual HPI path for the contracts in UNSN 2024-1. The various dotted lines show Morningstar DBRS' HPI projections at the AAA, "A," and B ratings category. The "A" HPI projections mirror the crisis HPI drop before home prices stabilize.

**Standard Baseline Stress HPI Projections for the Set of New Contracts in UNSN 2024-1**




Sources: Morningstar DBRS and CoreLogic.
Note: The HPI index of 100 is set at January 2000.

The pool for UNSN 2024-1 experienced weighted-average forward home price declines of 39.8% in "A" scenarios, and 51.9% declines on average in AAA scenarios. Per discussion in the Regulatory Risk—Analytical Adjustment section below, the HEI risk adjustments are further decremental to the trough points.

The above chart and data are for pool weighted averages; however, many zip codes (and hence contracts) are subjected to significantly worse declines before applying any risk adjustments. In AAA, there are zip codes that have troughs of up to -90.5% (meaning less than 10% home value remains). In AAA, the least harsh starting decline (all post-initial haircuts) is -42.7%, so the least punished zip codes are still losing close to half their starting value. For "A," the lowest decline is -32.9%, and the harshest is -69.6% (only circa 30% of post-haircut starting value remains).

**HPI Stress Summary—Home Price Drop, After Initial Valuation Haircuts**

| Scenario | Lowest Drop | Weighted Average | Highest Drop |
|---|---|---|---|
| "A" | 32.9% | 39.8% | 69.6% |
| AAA | 42.7% | 51.9% | 90.5% |

To provide relief, per the precedent for what is typically done for rated reverse mortgage transactions, and to normalize to some extent these HPI declines with those used in other mortgage methodologies, the adjustments are indexed off a 40% relief. The resulting curves, relevant to this analysis, charted in the graphic above, have the "A" scenario trough point with a 23.9% decline (60% of the 39.8%) prior to applying the mentioned risk adjustments (which pull the trough points 0% down, see the Regulatory Risk—Analytical Adjustment section discussion). AAA average trough similarly is a 31.1% decline.

### Default Rate

To establish the base-case (B rating level) Default Event, Morningstar DBRS generally uses a base-case default curve starting at 0% conditional default rate (CDR) on the closing date of the HEI, growing to 3% CDR on the 36th month after the HEI closing date, remaining at 3% CDR until the 47th month after the HEI closing date, declining to 1% CDR in the 120th month after the HEI closing date and remaining at 1% CDR thereafter. The CDR speed in any given month for any given HEI is multiplied by 2.0 if the projected combined LTV in that month exceeds 80%, and this can lead to higher lifetime cumulative default rates. Default events in the analytical tool are subjected to foreclosure and REO lags, plus associated costs, with different timelines per rating level before cash is released to the waterfall.

### Voluntary Prepayment Rate

For UNSN 2024-1, Morningstar DBRS used a base prepayment rate of 6%, 8%, and 10% for AAA, "A," and B scenarios, respectively. The payment rates for Unison contracts are notably lower than some other HEI issuers' contracts, and this is attributed in part to lockouts, and to the slower turnover rates of higher FICO homeowners (and in part to other contracts having deep risk adjustments that incentivize settlement to cease accruals of the capped IRR return). Morningstar DBRS scales these baseline curves depending on homeowner age. Homeowners less than 65 years of age are scaled 100%, whereas homeowners older than 80, 85, and 90 receive multipliers of 1.45x, 1.75x, and 2.1x, respectively. These multipliers act on the base rates to produce scaled actual rates, see the modeled results shown graphically below.

### Base Rates for UNSN 2024-1

**Base Voluntary Prepayment Rates, by Transaction Age**




**Base Default Rates, by Contract Age**




Source: Morningstar DBRS.

Case MDL No. 3201 Document 19-8 Filed 09/08/26 Page 20 of 49



## Scenario Results for UNSN 2024-1

### Voluntary Prepayment Rate




### Default Rate




Source: Morningstar DBRS.

## Scenario Results for UNSN 2024-1

### Home Price—Rebased to 100% After Starting Value Haircuts




### Contract Value (Current Exercise Value)




Source: Morningstar DBRS.

### Scenario Results for UNSN 2024-1

**Pool Value Factor**




**All-In Payment Rate (Voluntary Prepayment Plus Default)**




Source: Morningstar DBRS.

### Scenario Results for UNSN 2024-1

**Comparison of modeled all-in payment rates (instant one month and rolling 12 months) versus the input voluntary prepay rates. The Y-axis is single-month mortality (SMM).**




Source: Morningstar DBRS.

The above chart compares the actual modeled all-in pay rates versus the input base voluntary prepay rates. The actual all-in rates are higher than the CRR base rates (flat dashed lines) because (1) the realized voluntary prepayment rates do scale with homeowner age and time and (2) the cash flows from

the default wave are added to the voluntary. In this for UNSN 2024-1, both effects can be seen, but the effect of the default wave is most clearly seen.

### Discussion—Term Event (Contract Maturity)

Unison contracts in this pool are on 30-year (30Y) terms. The mechanics of what transpires when a contract reaches its stated maturity date (a Term Event) is somewhat unproven in the market. Ostensibly, the contract-holder (or servicer) may seek payment from the homeowner, write off the position, exercise the contract and take shared ownership in the property, or foreclose. Cash would then not appear unless and until the home was sold. At a 20% constant prepayment rate, 11% of the pool contracts would remain after 10 years, and 0.1% of contracts remain after 30 years. Some other issuers' programs offer HEI contracts with 10-year terms (10Y); however, none are included in this UNSN 2024-1 pool. Clearly what transpires at the Term Event is most germane for 10Y product, and less relevant for 30Y product (because only 0.1% of the pool is expected to remain extant after 30 years).

### Discussion—Contract Values

As illustrated in the Contract Value (Current Exercise Value) chart above, the B scenario's flat HPI profile sees contracts remain mostly flat. The "A" and AAA scenarios see declining home values, and this directly affects the shapes of these contract values (compare these with the HPI projections chart above). The "A" and AAA scenarios show contract values falling in the first few years, remaining in a trough until period 120, and only then rising again, as a direct manifestation of the Morningstar DBRS home value projections' shapes.

The Pool Value Factor chart above is a conceptual blend of the contract values shapes (which in turn are related to the HPI shapes) and the eroding pool factor (as the pool shrinks and the number of remaining contracts declines). After the 10-year point, the AAA (blue line) recovers, as home prices recover, then declines as the pool pays down. The AAA pool value recovers more than the other scenarios as a result of the scenario's slower prepayment rates, since there are more contracts remaining after the 10-year point to enjoy the recovery.

Morningstar DBRS notes that of the 965 contracts in the securitized pool, 27 options are not performing under contract terms and are in some form of delinquency status. (See the Performing Status table.) Considering the strong credit score profile of the borrowers and muted LTVs, Morningstar DBRS elected not to apply any additional stresses on these contracts.

### Additional Sensitivity Tests

To supplement the base stress test suite, Morningstar DBRS may run various sensitivity tests that can help inform its overall analysis. For example, if the transaction structure is deemed to be vulnerable to high prepayment speeds, Morningstar DBRS would run high prepayment scenarios in addition to the base stress scenarios. Another example would be during the Coronavirus Disease (COVID-19) pandemic, Morningstar DBRS would run modified (elevated) stress projections, such as using longer liquidation times. The ratings would be constrained by the more conservative results of these various runs.

The transaction assumptions consider Morningstar DBRS' baseline macroeconomic scenarios for rated sovereign economies, available in its commentary, *Baseline Macroeconomic Scenarios for Rated Sovereigns: March 2024 Update*, published March 27, 2024. These baseline macroeconomic scenarios replace Morningstar DBRS' moderate and adverse pandemic scenarios, which were first published in April 2020.

In the case of UNSN 2024-1, it was deemed not necessary to run additional stress tests for this transaction in the current environment.

**Regulatory Risk—Analytical Adjustment**

Because HEI is a comparatively new product, Morningstar DBRS has given considerable thought and weight to the regulatory environment in which the product is offered and the potential of future regulatory action against the product (by either state or federal regulators).

It is possible that future regulatory action could revolve around the classification of the HEI as a "loan" under the applicable statutory scheme. Were such a classification to occur, it could lead to numerous potential outcomes, including an assessment that the provider was engaged in activities that violated federal laws related to residential mortgage disclosures and state laws related to both the offering of mortgage products and the required licensing necessary to make residential mortgage loans. Future regulatory action could also be premised in an allegation that the provider was engaged in the unfair treatment of homeowners vis-à-vis the investor (or originator), meaning the investor would have been perceived as having extracted too large a stake to be warranted by their initial investment to which the homeowner agreed at the origination of the agreement. This argument would be more likely to arise in scenarios of high home price appreciation, where the homeowner, who had also enjoyed gains, now wanted to capture a higher portion of these gains rather than share them pursuant to the contractual requirements. Conversely, this argument would be less likely to arise in scenarios of low home price appreciation or home price depreciation.

The perceived regulatory exposures include, inter alia, lawsuits and arbitration actions; CFPB or FTC[6] sanction (or sanction by myriad state regulatory agencies); and the risk that the contracts may be reclassified as residential mortgages, which action may trigger potential allegations of violation of applicable state usury clauses.

In reaction to these concerns, Morningstar DBRS has acquired substantial legal memoranda, including memoranda from each Originator's counsel that has been reviewed for scope and content by Morningstar DBRS-retained counsel, that collectively address these concerns. In addition, Morningstar DBRS has applied an analytical adjustment to quantify and account for the regulatory risk, namely the regulatory risk analytical adjustment (RRAA).

6. These are Consumer Financial Protection Board (CFPB) and Federal Trade Commission (FTC).

Some HEI programs write contracts that provide greater downside protection (to the contract investor) than other programs. In a downside scenario, these downside protections are more advantageous to the contract investor's stake but are conversely less friendly to the homeowner's stake. Each provider uses different contract verbiage, which has been developed by internal and external legal counsel to describe this concept of the risk adjustment, but, in each instance, it boils down to how much the home value has to fall before the contract investor experiences a dollar of loss.

Unsurprisingly, all else equal, contracts that have more downside protection (i.e., more originator-friendly, less homeowner-friendly in a downside scenario) would naturally lead to better performance as collateral for securitizations. In a situation where a regulator is focused on downside scenarios, contracts with more downside protection could be viewed as riskier from a regulatory perspective.

Some HEI programs write contracts that share less upside with the contract holder or have other features that are more homeowner friendly. Morningstar DBRS' methodology related to the differences among HEI programs and how those differences may impact regulatory risk conservatively focuses solely on downside protection and does not consider other contract features.

The RRAA is designed to account for the additional regulatory risk in downside scenarios. Originators are not rewarded in Morningstar DBRS' analysis for greater contractual downside protections, i.e., contracts that are more originator-friendly in downside scenarios are not rewarded in its analysis with better ratings and/or advance rates. This rating system (using the RRAA) is designed to spur the market in a homeowner-friendly direction when considering downside protection for contract holders.

Morningstar DBRS' testing has shown that further haircutting home value is an ineffective mechanism to implement the RRAA, because the contracts that share lower downside exposure due to greater risk adjustments are less sensitive to such haircuts precisely for this very reason.

Morningstar DBRS' testing, however, shows that modulating the HPD curves is a highly effective mechanism to implement the RRAA. As such, the trough point of the HPD curves is adjusted in direct proportion to the risk adjustments, meaning a pool with a 15% risk adjustment (i.e., begins to experience losses if home prices decline more than 15%) will see trough points adjusted 15% lower.

For example, if a pool sees a 50% home price decline (typical AAA scenario), the RRAA would apply a 15% further adjustment or a 57.5% decline. These adjustments are designed to neutralize and adjust for these asymmetries.

The effective risk adjustment for this pool is 0% with all 965 contracts having no risk adjustment meaning the contracts experience loss versus the initial invested amount if home prices decline at all. Accordingly, the RRAA for this pool is 0%, which is the proportion by which Morningstar DBRS has scaled the trough points down (typically rounded down to the nearest 5%).

**Regulatory Risk—Summary of Legal Memoranda**

Morningstar DBRS and its counsel previously reviewed a memorandum provided by Unison's counsel (Mayer Brown) (the Memorandum). The Memorandum included the following components: (1) a discussion of the applicability of select federal consumer financial credit laws to Unison's home equity investment option product (the Option), which included analyses of the Truth-in-Lending Act, the Equal Credit Opportunity Act, the Real Estate Settlement Procedures Act, and the Fair Credit Reporting Act, as well as other federal consumer-credit related laws; (2) an assessment of the effects of an adverse determination by a state or federal regulator should the Option be reclassified as a "residential mortgage loan" or other form of consumer credit; and (3) confirmation that Unison's policies and procedures comply with applicable law.

In addition, the Memorandum contained certain information provided by Unison that was not subject to Mayer Brown's legal review or analysis. This information included descriptions of the following: (1) Unison's process by which it assesses state laws before beginning operation in any state; (2) the various matters Unison has addressed in connection with inquiries by or meetings with state and federal regulators; and (3) servicing processes prior to Option exercise events (described as permitted sale by homeowner, end of term, death of last surviving signatory, and material and uncured event of default). Company-provided information also included a sample state legal review reflecting the legal analyses prepared by third-party law firms prior to Unison's entry into a new state (here, a legal assessment for Nebraska was provided).

Notably, while it is not a legal opinion, the Memorandum represents a reasonable assessment of the law applicable to Unison and its offering of the Option. To that end, the Memorandum states as follows: "In sum, based on the federal consumer credit laws [Mayer Brown] reviewed, there is a reasonable basis to conclude that Unison has appropriately determined certain federal credit laws to be applicable or not applicable to the Options. . . ." Further, with respect to the servicing component of Unison's business, the Memorandum concludes that "[Unison] has appropriately developed written policies related to those federal laws applicable to the Options and its current business practices."

While Unison provided only one exemplar of the type of assessment local counsel performs in connection with the company's entry into a new market, it appears that such state-by-state analyses include a review of both state residential mortgage loan licensing and residential mortgage loan brokering laws. In addition, the exemplar included an analysis of the state's usury laws should an Option be recharacterized as consumer credit subject to interest rate limitations.

With respect to the effects of potential recharacterization of the Option as a residential mortgage loan, the Memorandum enumerates a "non-exhaustive list" of federal laws and regulations to which the Option might be subject. In addressing potential penalties were such a recharacterization to occur, the Memorandum notes that such penalties include "claims for damages, disgorgement or enforcement actions" while noting that, depending upon the cause of an action, the "enforceability of the Options could be impaired." In terms of potential remediation of any claims related to the recharacterization of

the Options, the Memorandum notes certain defenses may be available to Unison in connection with a provision in federal law that provides preemptive authority to certain creditors in connection with the origination of "federally related mortgage loans."

Finally, in terms of servicing its portfolio, the Memorandum states that Unison maintains policies that "reflect appropriate federal compliance policies and procedures, which contain the detail [Mayer Brown] would expect from a company like Unison that does not originate mortgage loans or other extension of credit."

### Legal/Structural Analysis

Morningstar DBRS employed external legal counsel to review certain items in the transaction relevant to its ratings analysis. The documents provided during the rating process included a printed preliminary private placement memorandum. As of the publication date, legal opinions and final transaction documents have been provided and reviewed. The representations, warranties, and enforcement mechanisms (listed in a separate publication and incorporated herein by reference) are acceptable to Morningstar DBRS and meet its published criteria. The representations, warranties, and enforcement mechanisms; third-party due-diligence findings; and transaction structure are summarized in later sections.

## Securitization Trust Summary

### Priority of Payments

On each payment date, available funds will be applied, sequentially, in the following order of priority:

1. First, pro rata, based on amounts due, to the indenture trustee, the owner trustee, the backup asset manager, the physical custodian, the electronic custodian, the auction agent and the asset manager, the indenture trustee fee, the owner trustee fee, the backup asset manager fee, the physical custodian fee, the electronic custodian fee, any fee owed to the auction agent for such payment date and the asset management fee, respectively (in each case, to the extent such fee has not previously been paid);
2. Second, sequentially, (i) pro rata, based on amounts due, to the bank parties, the owner trustee, the electronic custodian and the physical custodian for any expenses and indemnification amounts reimbursable to such parties, in each case, up to the annual expense cap (provided, that (1) any capped amounts will be payable on the next payment date subject to the annual expense cap applicable (if any) to such payment date, which includes the final payment date in any anniversary year (to the extent amounts remain under any group cap amount) and any payment dates in future anniversary years (to the extent amounts remain under the annual expense cap of such year), and (2) if an indenture default has occurred and is continuing, amounts reimbursable to such parties will not be subject to any annual expense cap or any group cap amount), and (ii) pro rata, based on amounts due, to the asset manager, the administrator and the backup asset manager for any expenses and indemnification amounts reimbursable to such parties, in each case, up to the annual expense cap (provided, that (1) any capped amounts will be payable on the next payment date subject to the annual expense cap applicable (if any) to such payment

date, which includes the final payment date in any anniversary year (to the extent amounts remain under any group cap amount), payment dates in future anniversary years (to the extent amounts remain under the annual expense cap of such year), and on any final payment date, and (2) if an indenture default has occurred and is continuing, amounts reimbursable to such parties will not be subject to any annual expense cap or any group cap amount), and, with respect to the asset manager, to reimburse the asset manager and the backup asset manager for any unreimbursed asset manager advances for the collection period, in each case, to the extent that the asset manager has not previously reimbursed itself or withheld such amounts pursuant to the asset management agreement (as calculated by the asset manager and notified in writing to the paying agent at least four (4) business days prior to the remittance date);

3. Third, to the Class A Notes, to pay the interest amount due and any unpaid cap carryover thereon;
4. Fourth, for each payment date other than the final payment date, to the reserve account, until the amount on deposit therein equals the reserve account required amount for such payment date;
5. Fifth, to the advance facility provider, any unreimbursed advance facility reimbursement amount;
6. Sixth, to the Class A Notes, to pay the note amount of the Class A Notes until the note amount of the Class A Notes is reduced to zero;
7. Seventh, to pay to the Class A Notes, the additional accrued amounts for the Class A Notes, including any additional accrued amounts that accrued on any earlier payment dates but that have not been paid, until the additional accrued amounts for the Class A Notes is reduced to zero;
8. Eighth, to the Class B redemption account, until the amount on deposit therein equals the Class B redemption account required amount;
9. Ninth, pursuant to an optional redemption, auction proceeds redemption, clean-up call or indenture default, to the Class B Notes, any remaining amounts to pay (a) the note amount of the Class B Notes until the note amount of the Class B Notes is reduced to zero and (b) any unpaid additional accrued amounts, including any additional accrued amounts that accrued on any earlier payment dates but that have not been paid, until the additional accrued amounts for the Class B Notes is reduced to zero;
10. Tenth, from amounts on deposit in the Class B redemption account, if any, up to an amount equal to the supplemental Class B redemption account required amount for such payment date, on a deemed “first-in, first-out” basis, to the Class B Notes, the additional accrued amounts for the Class B Notes, including any additional accrued amounts that accrued on any earlier payment dates but that have not been paid, until the additional accrued amounts for the Class B Notes is reduced to zero, subject to the Class B interim payment cap;
11. Eleventh, pro rata, based on amounts due, to the bank parties, the owner trustee, the electronic custodian, the physical custodian, the asset manager and the administrator any amounts owed but not paid under clause (ii) above because of the application of the applicable annual expense cap or group cap amount; and
12. Twelfth, any remaining amounts, to the certificateholders.

Amounts used to make payments of the note amount to the Class B Notes, in accordance with the ninth clause above, will be deemed to derive, first, from amounts on deposit in the Class B redemption account, if any, plus any amounts contributed by the certificateholder, and then from other sources of available funds.

Morningstar DBRS' ratings do not consider any additional accrued amounts.

### Structure

The transaction uses a sequential structure. This structure provides credit enhancement in the form of subordinate classes. These features increase the likelihood that holders of the most senior class of notes will receive regular distributions of interest and/or principal.

### Credit Enhancement

The credit enhancement provided for the benefit of the notes consists of (i) overcollateralization resulting from the excess of the value of the options over the note amount of the notes, an amount which will fluctuate over time due to a variety of factors, including but not limited to changes in the value of the options and the outstanding balances of the notes and any accrued interest thereon, which is dependent upon the amount and timing of resolution of the options, (ii) subordination of the Class B Notes to the Class A Notes pursuant to the priority of payments and (iii) amounts on deposit in the reserve account and (iv) with respect to Class B Notes, amounts on deposit in the Class B redemption account.

### Interest Rate, Note Rate, and Cap Carryover

The interest rate for the notes for each payment date and the related interest period will be a per annum rate equal to the fixed per annum rate set forth for the notes in the private placement memorandum.

The note rate for the Class A notes for each payment date and the related interest period will be a per annum rate equal to the lesser of (i) the interest rate in effect for such interest period and (ii) the applicable available funds rate with respect to such interest period, and the note rate for Class B notes for each payment date and the related interest period will be a per annum rate equal to the interest rate in effect for such interest period. With respect to any interest period relating to any payment date, each class of notes will bear interest in an amount equal to 1/360th the product of (i) the applicable note rate, (ii) the note amount of such class of notes as of the beginning of the applicable interest period (or, in the case of the initial payment date, the initial note amount of the notes) and (iii) the number of days in such interest period calculated on a 30/360 day count basis. Any such accrued interest amounts on the Class B Notes will be added to the note amount of the Class B Notes and be paid as principal and will be paid only after the Class A Notes are paid off in full.

The cap carryover for each payment date and the Class A Notes will equal the sum of (i) the excess, if any, of the interest amount for such class of notes on such payment date (calculated assuming the note rate is equal to the interest rate, regardless if the note rate for such payment date is equal to the

available funds rate) over the amount in respect of interest actually paid on such class of notes for such payment date, (ii) any remaining unpaid cap carryover on such class of notes from prior payment dates and (iii) interest on such remaining unpaid cap carryover referred to in clause (ii) above at the applicable interest rate (without regard to the application of the available funds rate) on a 30/360 day count basis. Accordingly, the note amount of the Class A Notes will not be increased by the amount of any cap carryover that holders of the Class A Notes are entitled to receive.

### Available Funds

Available funds are, with respect to any collection period and payment date or the date on which an optional redemption right is exercised or a mandatory auction occurs, the sum of (i) all collections received during such collection period in respect of the options (including subordination fees and amounts representing repayment by a homeowner of asset manager advances previously reimbursed to the asset manager), (ii) any subsequent recoveries applied with respect to the options for such payment date, and (iii) all or a portion of the amounts on deposit in the reserve account and, if applicable, the Class B redemption account with respect to such monthly period.

### Mandatory Call Date and Mandatory Auction

On the mandatory call date occurring on the payment date in May 2029 (after giving effect to all payments made on such date), if any notes remain outstanding, then the asset manager, or an auction agent appointed by the asset manager, will cause all of the options to be offered for sale at an auction on behalf of the indenture trustee for the benefit of the noteholders, which auction will occur within six (6) months following the mandatory call date; provided that controlling noteholders will have the ability to direct the asset manager to appoint an auction agent two (2) months after the mandatory call date (as further described below). The asset manager will provide written notice to the indenture trustee promptly after an auction agent has been appointed and again promptly after an auction has been scheduled. The indenture trustee will promptly post such notices to its website. If the noteholders have not received notice that the asset manager has scheduled such an auction or appointed an auction agent to conduct such an auction within two (2) months following the mandatory call date, then the controlling noteholders may direct the asset manager to appoint an auction agent designated by the controlling noteholders. To the extent the proceeds of such auction (as determined by the auction agent), net of any fees and expenses, together with all other available funds, are sufficient to pay all amounts outstanding on the notes (including any additional accrued amounts) and all other amounts including the outstanding fees, expenses and indemnities (without regard to the annual expense cap) of the transaction parties due and payable prior to payments on such notes in accordance with the priority of payments on the first payment date after such auction, then the proceeds of the auction will be applied on such payment date to pay such amounts in accordance with the priority of payments. If the auction does not result in sufficient proceeds, then the asset manager or the auction agent will be required to conduct another auction every six (6) months thereafter until the payment date occurring twelve (12) months after the mandatory call date. If that auction period ends prior to the occurrence of a sufficient proceeds auction, then an auction failure event will be deemed to occur. The occurrence of an auction failure event will constitute an indenture default. For the avoidance of doubt, the indenture

trustee will not be deemed to have notice or knowledge of an auction failure event unless a responsible officer of the indenture trustee receives written notice from the depositor and such notice specifies it is an indenture default. The fees charged by the asset manager and the auction agent in connection with any such auction will be paid (without regard to the annual expense cap) in accordance with the priority of payments.

The seller, the depositor and its affiliates may bid on the auction and the auction agent will provide the seller and its affiliates with notice of the amount of the highest bid received in connection with any auction before the closing of such auction; provided that if the potential purchaser is the depositor, the seller or any of their respective affiliates, the auction agent has obtained at least three (3) bids including at least two (2) independent bids in the secondary market in an arms-length transaction and at fair market value in order to maximize proceeds to the auction agent in respect of such options; provided further if the potential purchaser is the depositor, the seller or any of their respective affiliates, their respective bid may not exceed the fair market value thereof.

### Optional Redemption

The issuer (acting at the direction of the certificateholder representative) may, at its option, on any payment date beginning with the payment date in May 2026, redeem the notes in full at a price equal to the sum of (i) the aggregate note amount of the outstanding notes as of such optional redemption date, (ii) without duplication, any accrued and unpaid interest due on the notes through the optional redemption date (and any cap carryover), (iii) any unpaid fees, expenses and indemnification amounts of the deal parties without regard to the annual expense cap or the applicable group cap amount, and (iv) without duplication, any unreimbursed asset manager advances and any unreimbursed advance facility reimbursement amount under the advance facility credit agreement. The redemption price may be reduced by amounts owed to the seller or its affiliates in their capacities as holders of the notes, and any such amounts will be deemed to have been paid to the seller or such affiliate on the optional redemption date pursuant to the indenture. Following the exercise of the optional redemption, the issuer will wind up and terminate following the satisfaction and discharge of the indenture in accordance with its terms.

### Clean-Up Call

On any date on which either (x) the aggregate exercise value of the options remaining in the trust estate as of the last day of the related collection period is less than ten percent (10%) of the aggregate exercise value of the options as of the closing date (as determined by the asset manager) or (y) the aggregate investment payment of options as of the last day of the related collection period is less than ten percent (10%) of the aggregate investment payment of options as of the closing date (as determined by the asset manager), the asset manager (at the direction of the certificateholder representative) will have the option to purchase or cause to be purchased all of the options and REO properties for a purchase price equal to (i) the aggregate exercise value as of the date of any such purchase plus (ii) any unreimbursed asset manager advances, unrecouped asset manager advances, any unreimbursed advance facility reimbursement amount under the advance facility credit agreement and unrecouped advance facility credit agreement advances. For purposes of the clean-up call and the calculation of the aggregate

exercise value, REO properties will have the exercise value of the related options. The clean-up call price will be distributed in accordance with the priority of payments, without regard to the annual expense cap or any group cap amounts.

**Reserve Account**

The indenture trustee will establish on the closing date, and thereafter maintain, in the name of the indenture trustee, for the benefit of the noteholders, a reserve account that will be initially funded from a portion of the proceeds from the sale of the notes.

For as long as any notes remain outstanding, the notes will have the benefit of the reserve account to the extent there are insufficient available funds during a collection period to pay the amounts in clauses (i) and (ii) in the priority of payments, subject to the annual expense cap, except if an indenture default has occurred and is continuing. If available funds on any payment date will not be sufficient to pay in full the priority expense amounts due on such payment date, the available amount of such shortfall will be withdrawn from the reserve account for application as available funds pursuant to the priority of payments.

**Class B Redemption Account**

The indenture trustee will establish on the closing date, and thereafter maintain, a redemption account in the name of the indenture trustee for the benefit of the holders of the Class B Notes. On each payment date on and after which the Class A Notes are paid in full, the asset manager will instruct the paying agent at least four (4) business days prior to the remittance date, and the paying agent will, based on the information in such instruction, and pursuant to the priority of payments and to the extent funds are available for such purpose, deposit into the Class B redemption account funds as necessary to maintain in the Class B redemption account an amount equal to (A) if the expected redemption date has not occurred, the expected note amount of the Class B Notes on the expected redemption date, and (B) on and after the expected redemption date, the sum of (i) the note amount of the Class B Notes on such payment date (prior to any distributions made on such payment date), and (ii) any accrued and unpaid additional accrued amounts to which holders of the Class B Notes are entitled. The supplemental Class B redemption account required amount for each payment date is an amount equal to the excess, if any, of the amount on deposit in the Class B redemption account over the Class B redemption account required amount calculated assuming clause (B)(ii) is equal to zero for such payment date.

After the Class A Notes are paid in full, the paying agent will recalculate the Class B redemption account required amount on each payment date prior to the earlier to occur of the optional redemption date or expected redemption date, and any supplemental Class B redemption account required amount will be applied as available funds on each payment date. Such amount will remain on deposit in the Class B redemption account and will not be used to pay the Class B Notes until it is applied pursuant to the priority of payments.

Upon the occurrence of an optional redemption, auction proceeds redemption, clean-up call or the occurrence and continuance of an indenture default (including upon the occurrence of an auction failure event), the paying agent will withdraw any amounts remaining on deposit in the Class B redemption account and apply such amounts in accordance with the priority of payments. Thereafter, no additional deposits to the Class B redemption account will be made. An optional redemption may be exercised by the issuer after the optional redemption date, regardless of whether the Class A Notes have been redeemed (and regardless of whether amounts have been deposited into the Class B redemption account as described herein).

All amounts deposited to the Class B redemption account will be held in the name of the indenture trustee for the benefit of the Class B Noteholders in accordance with the terms and provisions of the Indenture. Any interest earned on funds on deposit in the Class B redemption account will be distributed as available funds in accordance with the priority of payments on the immediately succeeding payment date.

### Asset Manager

Odin New Horizon Manager LLC will act as the asset manager for the issuer and will enter into an asset management agreement with the issuer and the indenture trustee, pursuant to which to the asset manager will be responsible for all asset management activities, including, but not limited to, the exercise of options on behalf of the issuer and the collection of proceeds, homeowner contact responsibilities, as well as obligations to the issuer for making asset manager advances.

### Backup Asset Manager

BSI will act as the backup asset manager of the options on behalf of the issuer and the asset manager pursuant to the backup asset management agreement and will assume the asset management duties for the options if the asset manager fails to perform certain obligations under the asset management agreement and is terminated as asset manager.

## Representations, Warranties, and Enforcement Mechanisms

Below is a summary of key elements of the representation and warranty (R&W) framework in the Unison 2024-1 transaction.

| **R&W Framework** | |
|---|---|
| **Transaction R&W** | 34 R&W with respect to the options |
| **R&W Provider** | Odin New Horizon Real Estate Fund LP |
| **Material Breach** | The seller will make certain representations and warranties regarding the options to the depositor, the issuer and the indenture trustee, and the seller will be obligated to cure or repurchase the affected options (or any related REO property) due to a material breach of a representation and warranty made by the seller under the first-tier sale agreement (the options sale agreement between the seller and the depositor).<br>Material breach means any breach of a representation or warranty with respect to an option that has caused or is reasonably expected (as determined by the seller in its good faith discretion) to cause the value of such option to be materially and adversely affected or is reasonably expected (as determined by the seller in its good faith discretion) to materially |

| | |
|---|---|
| | impair the ability of the asset manager or the indenture trustee (at the written direction of the controlling noteholders) to enforce payment of any obligations under the related option agreement or to realize the benefits of, or exercise the rights under, the option.<br>Material document defect means a defective or missing document that is preventing or materially delaying or is reasonably expected to materially delay (a) the realization against the related optioned property through foreclosure or similar loss mitigation activity or (b) the enforcement of payment of any obligations or the realization of the benefits of, or exercise the rights under, the option. |
| **Breach Tests** | No prescribed tests |
| **Remedy** | The cure or repurchase of the affected option by the seller will be the issuer's sole remedy for any material breach or material document defect with respect to any option included in the trust estate. |
| **Dispute Resolution** | n/a |
| **Knowledge Qualifiers** | 10 with respect to R&W made on the options |
| **Material Breach Determination** | n/a |

If, upon discovery by the seller or receipt of written notice thereof by the seller, any of the representations and warranties are breached and such breach is a material breach, or upon discovery by the seller or receipt of written notice by the seller of any material document defect with respect to any option sold to the issuer, then, subject to the terms of the indenture, the seller will be obligated to cure the related breach or document condition, as applicable, or repurchase the affected option from the issuer at the related repurchase price. The proceeds of any such repurchases will be deposited by the seller into the collection account as available funds.

The seller will have a period of sixty (60) days following its discovery or receipt of written notice of a material breach or material document defect to cure such breach or defect. If the seller has not cured a material breach or a material document defect by the end of the related cure period but is actively working to cure such breach or defect, such cure period will be extended for so long as the seller needs to effect a cure, but in no event will such cure period be extended more than thirty (30) additional days. In the event that a material breach or a material document defect is not cured prior to the expiration of the applicable cure period, the seller will repurchase the affected option at the applicable repurchase price within thirty (30) days of the expiration of the related cure period. Such cure or repurchase of the affected option by the seller will be the issuer's sole remedy for any material breach or material document defect with respect to any option included in the trust estate.

In the case of any repurchase of an option as a result of a material breach or a material document defect, the seller will be obligated to repurchase the affected option at the repurchase price. To the extent that any such option is not repurchased by the seller and a loss occurs on such option or recoveries in respect of such option are less than anticipated, holders of notes may incur a loss.

Upon receipt of such repurchase price, the issuer will transfer its interest in such option to the seller on an "as-is," "where-is" basis, without any representations or warranties other than with respect to the issuer's clear and marketable title to such purchased options and all other related assets, and any related liens held by the indenture trustee will automatically release thereon.

The seller will not have any liability arising from the ongoing ability or inability of the homeowners to make any payments under the options or any senior loan on the related optioned property, and the seller's repurchase obligations under the first-tier sale agreement will not constitute an unconditional or other guarantee by the seller of the collectability of the options. Morningstar DBRS has reviewed the R&Ws in this transaction and determined they are sufficient.

**Third-Party Due Diligence**

Recovco Mortgage Management, LLC (Recovco) performed the third-party due-diligence review for this transaction. Morningstar DBRS conducted a review of the TPR firm and believes the company has the capability to effectively perform residential mortgage due-diligence reviews.

For this transaction, due diligence was performed on a sample of HEIs. The diligence review was conducted in September and October of 2021 and in 2024 via files images provided to Recovco. The title lien review was conducted in 2024. Recovco had selected a random sample of 965 HEIs (296 of the 965 options at such time) of the HEIs in the pool for Underwriting guideline and data integrity, documentation, appraisal and title and lien reviews. Because HEIs are not subject to the same regulations as residential mortgage loans, a regulatory compliance review was not performed.

The scope of the due-diligence review included the following:

1. Underwriting Guideline and Data Integrity Review: The Underwriting Guideline review included a portfolio of Client's Investments to determine if they are in compliance with certain criteria in the underwriting guidelines. The documents for elements in the data tape were reviewed and confirmed.
2. Confirmatory Document: The review included confirming the proper execution and checking the record of the presented critical documents.
3. Appraisal Review: The review included making a reasonable assessment of whether the appraisal was thorough and complete, and the appraised value appeared to be supported.
4. Title/Lien Review: The review included confirming the recording of appropriate lien with the correct amount and lien position and to review for other outstanding liens and the position of those liens.

The TPR firm performed initial reviews and assigned grades for credit and valuation. Following the initial grading, additional information and supporting documentation may have been provided by the originator to clear outstanding conditions. Morningstar DBRS received a comprehensive HEI-level analysis from the TPR firm that includes initial grades, final grades, and detailed commentary on the rationale for any changes in grades, including compensating factors and waivers.

For this transaction, the TPR firm provided Morningstar DBRS with a written attestation that generally includes the following:

- The diligence review was conducted without influences from the Sponsor of the transaction.
- The review was completed in accordance with Morningstar DBRS' third-party due-diligence criteria.

- The reviewers have the appropriate level of experience to complete the due-diligence review.
- Ample time was given to the firm to perform the review and report the findings to Morningstar DBRS.

### Operational Risk Evaluation

#### Originator and Servicer: Unison Agreement Corp., Unison Agreement AO Corp., and Odin New Horizon Manager, LLC

Unison Agreement Corp. and Unison Agreement AO Corp. are the originators and Odin New Horizon Manager, LLC is the asset manager/servicer of the contracts in this transaction. The originators and asset manager/servicer are affiliated companies and will be collectively referred to as Unison or the Company. (Morningstar DBRS performed an onsite operational risk review of Unison's platform and believes the Company is an acceptable Home Equity Investment (HEI) contract originator and asset manager/servicer with a backup asset manager/servicer that is acceptable to Morningstar DBRS.

Headquartered in San Francisco, Unison is a Delaware LLC, SEC-registered investment advisory firm that is a wholly-owned subsidiary of Real Estate Equity Exchange Inc. (REX). REX is a Delaware corporation formed in 2004 that began offering the HEI product in 2006. Unison was founded in 2011 by Thomas Sponholtz, the current Chief Executive Officer and Chairman. Between June 30, 2013 and March 31, 2024, Unison originated approximately 10,400 HEI contracts with an aggregate investment amount of more than $973.9 million. The Company is staffed with 80 full-time employees and has offices in San Francisco and Omaha, Nebraska. Unison also utilizes a third-party vendor located in the Philippines that provides six dedicated full-time staff to answer inbound customer service calls and routine email correspondence.

Under the Unison HEI program, the homeowner can choose to receive a maximum investment amount (currently up to 15% of the home's agreed-upon value) at origination in exchange for 4.0 times the investment percentage (up to 60%) of the change in value at settlement. The amount due at settlement is based on the appraised value or sales price of the home at the time of repayment. Both the homeowner and Unison share in a percentage of the change in the value of the property from what it was at the time of origination to the settlement date.

Once the customer is qualified and a HEI is executed, the homeowner receives an upfront lump-sum cash payment that has no interest rate, monthly payment obligations, or restrictions as to the use of funds. The homeowner is required to settle the HEI in full within 30 years of the origination date and no partial payments are allowed. The first three years (or five years, depending on the contract) of the agreement are considered a lockout period. If the home sells for less than the initial agreed-upon value during the lockout period, Unison does not share in any loss. After the lockout period, the homeowner can terminate the agreement at any time by either selling the home or buying out Unison; however, Unison does not share in any decrease in value of the home if the homeowner exits the contract through a buyout.

The HEI is not a loan. No monthly payments are ever due and the homeowner's repayment obligation under the contract is not reported to the credit bureaus. However, the homeowner agrees to limit the amount of debt they incur until the HEI is repaid (maximum authorized debt), which is typically capped at 70% of the appraised value of the home as of the day of the agreement. Unison secures its interest in the home by recording a lien on the home, which is subordinate to any preexisting mortgage liens. The homeowner is considered to be in default if they miss a payment on any of the senior liens, incur more than the maximum authorized debt, or fail to pay taxes, insurance, and/or homeowners' association fees on the home. In such cases, the customer can be required to repay the HEI in full, sell their home, or be subjected to foreclosure action. In the event of a shortfall in the settlement amount due Unison, the homeowner has no obligation beyond the proceeds available from the subject property.

Unison's senior management team has a combined 25 years of related industry experience and approximately four years of Company tenure. As of March 31, 2024, the Company had approximately 80 full-time employees, which included four underwriters, a licensed appraiser, nine asset servicing employees, two in-house attorneys and a dedicated chief compliance and audit officer. Unison has an onboarding training program dedicated to educating employees about the mechanics of the HEI agreements. This program also provides more specific training related to interacting with customers on common issues, including contract termination events. Since the Unison agreement is an option agreement and not debt, Company employees are not required to complete any formal regulatory or compliance training, including Fair Debt Collection Practices Act training.

Unison does not have a formal internal or external audit process. The internal quality control team recalculates the loan-to-value ratio (LTV) and the debt-to-income ratio (DTI), confirms the original appraised property value of the property, verifies adherence to program guidelines, reviews the chain of title, and confirms Unison's lien position on 100% of originations. In addition, the quality control team also listens to a random sample of calls from sales employees to prospective customers to ensure compliance with internal guidelines.

Unison targets homeowners that have equity in their homes. Unison's lead channel for sourcing its HEI product is direct mail where target areas and properties are identified from the Company's proprietary property valuation model. The Company also makes use of digital channels driven primarily by paid search (e.g., Google ads) and indirect partnerships.

Unison has established specific processes and materials to help educate customers about how its HEI program works. This includes a web-based educational guide that is part of the application form where the applicant must acknowledge specific educational information prior to signing the offer letter. Once the homeowner signs the application, Unison begins its document collection process, which entails obtaining a copy of the homeowner's insurance policy, income and asset verification, and appraisal and inspection reports. Unison pulls a soft credit report and collects both customer income documentation and mortgage statements (if applicable). This information is used to generate the DTI and LTV, and is incorporated into a pass/fail proprietary default model that is largely based on FICO, DTI, and LTV. At

application submission, Unison provides all customers with a detailed product guide that contains a comprehensive explanation of all of the product features and calculations. The guide places particular emphasis on the various potential outcomes at settlement and the payment the homeowner will need to make to Unison at that time.

Unison currently originates contracts in 29 states and the District of Columbia. Acceptable properties include, but are not limited to, single-family homes, condominiums, two- to four-unit properties, townhouses, and planned unit developments (both owner- and non-owner-occupied). Primary homes require a minimum FICO of 620, allow for a maximum home debt of 70%, and a minimum homeowner equity of 10% (after factoring in Unison's investment amount). Second homes have a minimum FICO of 680, a maximum debt limit of 65%, and a minimum homeowner equity of 30%. Full appraisals and Unison's proprietary automated valuation model (AVM) model are used as part of the underwriting process, but only the appraisal can be used to determine the final value of the property. Prospective customers who are late on their mortgage payments, have filed for bankruptcy, or been foreclosed on within the past five years are not eligible for a Unison HEI. All homeowners are required to be current on their property insurance and taxes as a condition to close.

All contracts are underwritten by one of the four underwriters that average three years of industry experience. Underwriters use a proprietary origination system that streamlines many parts of the underwriting process. No exceptions to underwriting guidelines are permitted. Office of Foreign Assets Control checks are completed and all closings are done with an in-person notary. Unison secures its interest in the property by recording a mortgage lien and/or deed of trust with the respective county recorder's office.

Unison uses a proprietary asset management/servicing platform for portfolio management and asset servicing. Given that no payments are due until the option is terminated, the Company does not engage in traditional servicing or collections activities during the term of the agreement. Unison's asset servicing staff of nine individuals, and an outsourced / offshore customer service staff of six individuals, who typically interact with customers in response to inquiries or during potential option settlement events. The servicing staff is also responsible for ensuring that all homeowners receive quarterly statements with an estimated high and low value of the home and the current repayment amount based on both value estimates. Homeowners are informed of the process required for terminating the agreement through their Unison quarterly statements, monthly newsletters, and by accessing their account on the Company's portal.

In most cases, a homeowner will contact Unison when they are considering terminating the agreement by either selling the property or buying out the contract. The Company will request documents to help determine the current market value of the home. In the case of a sale of the property, these documents typically consist of a purchase agreement plus all bids, if applicable; completed notice of intent to sell form; property inspection if completed; listing agreement; and multiple listing service listing. If the homeowner is considering a buyout of Unison, they are required to complete a termination application

form, and a third-party appraisal will be ordered at the homeowner's expense. If applicable, remodeling adjustments will be considered (after the first three years of the agreement) if, during the term of the contract, the homeowner has made significant improvements to the property that increase its market value independent of market forces. The value of the remodeling adjustment is determined by providing before and after photos and receipts, if needed, to obtain a third-party appraisal in which the actual home value is compared with the hypothetical value had the remodeling not taken place. The difference, if any, between these two values is applied to reduce the actual home value and reduce the payment due Unison. In addition, at origination of the HEI, a deferred maintenance agreement is prepared that identifies potential concerns in the inspection report or appraisal, which if left unresolved, may adversely affect the value of the home at termination of the contract. All documentation related to the termination (appraisals, inspection reports, etc.) is also reviewed to identify any deferred maintenance issues that may result in an increase in the payment due Unison at time of settlement.

Unison receives monthly data from external vendors that tracks senior lien default status, property tax and insurance payment performance, change of address, bankruptcy and foreclosure status, and deceased homeowners. The Company also orders title reports, as necessary, and monitors home values each month through the use of its proprietary AVM model. Additionally, Unison has secondary portfolio-level insurance coverage in the case of a lapsed insurance policy. The Company reviews all triggered alerts from its vendors and, if a violation is suspected, the contract is escalated for further diligence and remediation with the Asset Management and Servicing teams. If a homeowner default is confirmed, the Asset Management team will manage the default in accordance with the terms defined in the related HEI. If an uncured instance of default is deemed to materially affect the interests of the contract holders, Unison may advance tax, homeowners association, or insurance payments, and/or seek foreclosure action against a homeowner.

Unison's technology infrastructure is cloud based with Salesforce as its main origination and asset management platform. AWS is used for running website and in-house data services. Unison has point-in-time recovery for most of its databases—which are stored in AWS—with other data sources being backed up at least daily or per the SaaS vendor's policy. The Company has a formal disaster recovery and business continuity plan in place. The last formal tabletop exercise was completed in December 2023 with no material issues identified.

**Backup Servicer: Servis One, Inc. dba BSI Financial Services**

Servis One, Inc. (Servis) dba BSI Financial Services (BSI) is the backup servicer in this transaction. Morningstar DBRS performed an operational risk review of BSI's loan servicing operations and believes that the company is an acceptable loan servicer for Morningstar DBRS-rated transactions and an acceptable backup servicer for HEI contracts.

BSI Financial Holdings, Inc. was incorporated in Delaware in 2012. Its primary subsidiary is BSI, which was originally formed in 1986 and bought by Servis in 2006. The company's principal business is servicing, subservicing, and performing quality-control (QC) reviews of mortgage loans on behalf of

various investors, clients, and business process-outsourcing entities. BSI is approved as a servicer by Fannie Mae, Freddie Mac, the Federal Housing Administration, and the U.S. Department of Veterans Affairs. The Company is headquartered in Irving, Texas, with operations centers in Titusville, Pennsylvania; Concord, San Diego, and Irvine, California; Hollywood, Florida; and Hunt Valley, Maryland. As of December 31, 2023, BSI serviced approximately 224,468 mortgage loans totaling $52.5 billion and was the primary and/or backup servicer for approximately 11,350 HEIs with an aggregate contract balance of nearly $1.123 billion.

BSI has three primary operating divisions: loan servicing, mortgage origination and mortgage servicing rights (MSR) acquisition, and loan review and due diligence services. The company's principal business is servicing, subservicing, and performing QC reviews of mortgage loans on behalf of investors, clients, and business process-outsourcing entities. BSI's operations leverage a number of subsidiaries, including one located in India that performs back-office servicing and reporting functions. Other subsidiaries perform REO management, valuations and valuation reviews, non-judicial foreclosure processing in four states, escrow closings for loan originations in California, and title and title support services.

Over the past year, BSI has hired new executive managers into the roles of president, chief operating officer, senior vice president of agency servicing, and senior vice president chief people officer. Senior management averages 15 years of industry experience, including seven years with the company. The company has approximately 570 full-time equivalent (FTE) employees, including 244 U.S.-based servicing personnel plus 140 offshore FTE in India who perform back office non-customer facing functions. BSI has a dedicated staff of six people who are fully trained on the HEI product and are responsible for responding to customer inquiries, managing all contract settlement and resolution requirements, and producing customer statements. BSI leverages a number of external resources in its training programs, including, VRM University, VA TMS, and Mortgage Bankers Association. Depending on the job functions, new hires receive between 40 and 80 hours of job-specific training in addition to 40 hours of mandatory new-hire training. Employees complete annual recertification training that averages a minimum of 20 hours. In addition, monthly training sessions are held based on the training needs identified by operational leads.

BSI maintains an adequate system of internal controls. Its regulatory compliance department monitors industry alerts as well as new state and federal laws and regulations that require changes to existing processes. The regulatory compliance department tracks the implementation of required process changes and works collaboratively with the appropriate operational units to ensure that written action plans are developed and implementation efforts are completed in a timely and effective manner. The QC department monitors operational processes to ensure that they are operating effectively and in compliance with policies and procedures, investor guidelines, and applicable laws and regulations. The regulatory compliance department leverages QC's testing to determine if the operations are adhering to applicable laws and regulations. QC testing includes call monitoring and monthly assessments of work products in the operational units. More than 50 process-specific reviews span various areas including conversions, payment processing, escrow, default, adjustable-rate mortgages (ARMs), cease and desist,

foreclosure, bankruptcy, and lien release. In addition, the company leverages its proprietary Asset360 and Libretto applications, which are analytics engines that check all loans in its servicing data warehouse for nearly 800 exceptions every day with exception reports routed to operations, administration, and on-boarding teams for resolution.

BSI's internal audit function is outsourced to a third-party vendor that reports directly to BSI's board with a dotted line to the company's controller. The board, in conjunction with executive management, sets a budget and selects areas for audit each fiscal year based on an assessment of perceived risks. Management may also request that targeted audits be conducted during the year. The third-party vendor reports its findings to the board on a quarterly basis, including recommendations, management responses, and action plans. The Issues Management department manages the completion of action plans and verifies that they have been successfully implemented.

BSI maintains adequate loan administration capabilities for new loan boarding, cash management, escrow administration, investor reporting, and customer service. Loans are electronically boarded to the company's servicing system with robust quality assurance (QA)/QC processes in place. BSI's pre- and post-boarding QA includes more than 130 data validation fields. The company also performs a post-boarding document-to-system review on 100% of special products, including ARM loans and 10% of fixed rate loans. If the error rate on the fixed-rate loans reviewed exceeds 5%, the sample is increased. All loans are assigned a single point of contact (SPOC) at the time of boarding.

BSI receives payments through various channels, including a lockbox for physical checks, automated clearing house (ACH), pay-by-phone, Interactive Voice Response (IVR), mobile application, its website, and Western Union. As of December 31, 2023, BSI's lockbox at PNC Bank was responsible for processing 87% of the checks received, averaging between 13,000 and 14,000 checks each month. Payment-clearing accounts are reconciled daily, and bank reconciliations are completed within 45 days, except government-sponsored entity-related bank reconciliations, which are completed within 30 days. BSI outsources its real estate tax and insurance processes to third-party vendors.

BSI's customer care department uses IVR authentication and skills-based routing. A borrower portal that leverages Asset360, BSI's proprietary data warehouse and reporting application, enables consumers to receive loan statements and documents through its ePresentment capability. In addition, a proprietary mobile application enables borrowers to manage their mortgage loans using mobile devices. Borrowers can verify loan payments, view transaction history, identify future payment dates and amounts, make ACH payments, and request loan verifications and pay-off statements using the app. In addition, it allows delinquent borrowers to monitor events and milestones in the loss mitigation process and communicate with their BSI representative. Borrowers with multiple loans serviced by BSI also have the ability to view all of their loan information, ePresentment, and payment options under one account.

Early-stage collection calls begin on the fourth day of delinquency, using manual and automated contact attempts. The core servicing system is effectively augmented with a cloud-based IVR and call center

system. Skip tracing is completed for loans for which BSI cannot establish a right-party contact through phone or mail attempts. BSI proactively attempts to contact borrowers in areas where Federal Emergency Management Agency disasters have been declared. If an imminent default is determined, the collector transfers the call to the SPOC.

BSI's SPOCs each handle a pool of approximately 140 loans and are assigned on an investor-specific basis to focus on workout strategies based on the investor's guidelines. BSI also has a dedicated SPOC team for non-consumer business-purpose loans. Borrowers can complete a loss mitigation application online through BSI's borrower portal. The SPOCs are supported by processors who handle loss mitigation documentation. Loan modification processing is centralized in the company's Irvine, California, location. The loan modification fulfillment department standardizes functions in processing, underwriting, and compliance so financial packages can be reviewed within 48 hours of receipt and required letters can be sent out in a timely manner. A QA analyst monitors loss mitigation timelines to identify exceptions and escalate for resolution. BSI has a dedicated team of collectors and loss mitigation agents to focus on delinquent borrowers not actively engaged in the loss mitigation process. Collectors attempt to re-engage these borrowers and connect them with their SPOCs to pursue workout options.

BSI refers non-business purpose loans to foreclosure after they become more than 120 days delinquent and investor approval, if required, has been received. A foreclosure checklist incorporating loss mitigation department approval is completed prior to referral to outside counsel. Bankruptcy processing is handled in-house to facilitate coordination with the loss mitigation and loan administration departments. A third-party vendor scrubs BSI's servicing portfolio monthly to check for new bankruptcy filings and to update existing bankruptcy cases. Asset360 exception and pipeline reports are used to monitor compliance and timeline effectiveness. Attorney performance is monitored with scorecards. BSI maintains a national network of approved real estate brokers for disposing of REO properties with broker compliance and performance monitored through scorecards. Once an REO property is vacant, BSI obtains interior valuations. Depending on the investor, two or three valuations are obtained, which may include an appraisal. An asset manager will complete a desktop reconciliation and recommend a value and disposition strategy to the investor for approval if required. REO strategies can include repair, lease and hold, auction, bulk sale, or listing the property as-is. As of December 31, 2023, BSI had 80 REO properties totaling $16.6 million.

BSI uses Sagent's LoanServ as its core servicing system. In addition, BSI has developed ancillary proprietary applications that are utilized enterprise wide. BSI CARES, a proprietary software, is the company's platform used for servicing QC and due diligence. Loan servicing functions are connected via a central hub, BSI Asset360, a proprietary digital analytics platform. Asset360 is designed to perform surveillance and QA/exception-based processing and also serves as BSI's investor-reporting portal. BSI continues to enhance Asset360 exception reporting to ensure that discrepancies are captured.

The company functions in a cloud-based environment, which provides flexibility for increasing the scale of the servicing portfolio. Primary data storage is backed up nightly and replicated from the main data

center in Titusville, Pennsylvania, to the backup data center in Richardson, Texas. Disaster recovery tests are conducted each year with the March 31, 2024, test being successfully completed.

**Legal Final Maturity Date**

The payment date will occur in April 2050, but the actual final payment on the notes may occur earlier and could occur significantly earlier than such date. If necessary to pay the notes in full on their legal final maturity date, the assets of the issuer will be sold as provided in the indenture.

**Monitoring and Surveillance**

The transaction will be monitored in accordance with the Morningstar DBRS *Rating and Monitoring U.S. Reverse Mortgage Securitizations* methodology.

**Methodologies**

The following are the methodologies Morningstar DBRS applied to assign ratings to the above-referenced transaction. These methodologies can be found on dbrs.morningstar.com under the heading Methodologies & Criteria. Alternatively, please contact info-DBRS@morningstar.com or contact the primary analysts whose information is listed in this report.

- *Rating and Monitoring U.S. Reverse Mortgage Securitizations*
- *Interest Rate Stresses for U.S. Structured Finance Transactions*
- *Third-Party Due-Diligence Criteria for U.S. RMBS Transactions*
- *Legal Criteria for U.S. Structured Finance*
- *Operational Risk Assessment for U.S. RMBS Originators*
- *Operational Risk Assessment for U.S. RMBS Servicers*
- *Morningstar DBRS Criteria: Approach to Environmental, Social, and Governance Risk Factors in Credit Ratings*
- *Representations and Warranties Criteria for U.S. RMBS Transactions*

# Appendix A: Morningstar DBRS Analytical Tool

The Morningstar DBRS Reverse Mortgage Analytical Tool—Performing Contracts is a quantitative tool that has been enhanced to assess the credit risk of performing HEI. The tool cash flow results are used as a starting point in the rating process. Deal-level adjustments may be made as deemed necessary during the evaluation of the transaction. The tool projects total cash flows (interest plus principal) from a pool of underlying HEI contracts. There are three results that can occur with an HEI: death, default, and prepayment. The Analytical Tool uses a Monte Carlo simulation to generate these results and averages the cash flows from each simulation for each HEI contract to calculate the Available Funds at the AAA, "A," and B rating levels. The other rating levels are interpolated.

### Death

When a homeowner dies, the heirs have the option to pay off the contract, which may involve selling the house. If they choose not to do this, such as if the house value is less than the lien balances, for example, the heirs may give up the house to the lien holders (that is, deed in lieu). If the heirs decide not to do these things, the servicer of the most senior lien will need to foreclose on the property. Generally, the time for foreclosure may be shorter because there is no one to contest the foreclosure, no requirement to attempt to modify the contract, or other actions that are part of servicing defaulted forward mortgages.

In the tool, the probability of death is determined using the life expectancy tables from the Social Security Administration and contract-level inputs, such as age and gender. If the homeowner dies with equity in the home, the tool will sell the property and repay the contract out of the funds remaining net of paying off any senior liens first. If the tool determines insufficient home value, it will assume the senior liens default (see discussion below), but in these cases if there are insufficient funds to pay off the senior liens, the contract will effectively recover nothing.

### Default

When using the tool for Reverse Mortgages, if the tool computes there is insufficient value in the home, the tool will default the contract and calculate a loss severity using the same calculation as in the Morningstar DBRS Credit Analytical Tool. The timelines for foreclosure and REO will be set by the rating committee. (The REO timeline is separate, as the reverse mortgage contract no longer accrues interest when the home is in REO.) When using the tool for HEI, however, the tool simply computes the remaining funds available net of paying off all senior liens first. If the tool computes there is insufficient value in the home, then the HEI contract will capture no available funds irrespective of the liquidation mechanics, and the tool will compute the contract's value as zero.

The Default Event is used to project the likelihood that a homeowner (1) fails to pay certain expenses (e.g., senior mortgage contracts, property taxes, or homeowner's insurance premiums), (2) fails to maintain the home, (3) declares voluntary or involuntary bankruptcy, (4) fails to occupy the home as their primary residence, (5) defaults on more senior liens on the property, or (6) lets the term of the HEI expire at the stated maturity date. (For modeling purposes, Morningstar DBRS assumes that homeowners default on all outstanding HEIs that reach their stated maturity dates and applies the same loss severities as applied to Reverse Mortgage NPLs.)

Default probabilities are modeled using a default curve (see below). First, a base curve is assumed, which will be the same for every homeowner. Then this base curve is adjusted for every homeowner using contract-level data. Probabilities from the adjusted default curve will be used in Monte Carlo computations. Morningstar DBRS included a default curve at each rating level, which can be set up by the rating committee. There is also a multiplier in the tool that increases the probability of default when the LTV is greater than an input level. The input level will be determined by the rating committee. To review a more detailed description of the basic framework, please see the methodology *Rating and Monitoring U.S. Reverse Mortgage Securitizations* (Appendix 3—Home Equity Investments Methodology) published July 17, 2023. This is available at dbrs.morningstar.com.

**Prepayment**

The Prepayment Event is used to project the likelihood of a homeowner (1) transferring the property's title and/or moving out of the home (a Mobility Event), (2) moving into an assisted living/dependent care facility (a Morbidity Event), or (3) repaying the HEI typically to take advantage of market conditions that offer access to additional home equity (a Refinance Event). Prepayments speeds are typically faster for HEIs than reverse mortgages based on historical observations. HEIs are typically used by homeowners for short-term access to the equity whereas reverse mortgage contracts are typically used by homeowners to provide longer-term funding used to live out their lives in their home.

As homeowners age, the prepayment level increases likely because many older homeowners move into assisted living facilities. The tool includes a prepayment ramp, and the input is the maximum constant prepayment rate, which will be set by the rating committee. The tool increases the likelihood of prepayment for older homeowners and reduces it for younger homeowners. Prepayment probabilities are modeled using an SMM curve. First, a base curve is assumed, which will be the same for every homeowner. Then this base curve is adjusted for every homeowner using contract-level data. Probabilities from adjusted prepayment curves will be used in Monte Carlo computations. To review a more detailed description of the basic framework, please see the methodology referenced above.

**Summation**

In Monte Carlo scenarios, death, default, and prepayment for each homeowner are modeled as random events using uniformly distributed random numbers and probabilities described above. Once timing and

the type of random event are established, cash flows for the homeowner are calculated. Finally, homeowner-level cash flows are summed up to come up with deal-level cash flows.

# Appendix B: Morningstar DBRS Criteria: Approach to Environmental, Social, and Governance Risk Factors in Credit Ratings

| ESG Factor | | ESG Credit Consideration Applicable to the Credit Analysis: Y/N | | Extent of the Effect on the ESG Factor on the Credit Analysis: Relevant (R) or Significant (S)* |
|---|---|---|---|---|
| Environmental | | Overall: | N | N |
| | Emissions, Effluents, and Waste | Do the costs or risks result in a higher default risk or lower recoveries for the securitized assets? | N | N |
| | Carbon and GHG Costs | Do the costs or risks related to GHG emissions, and related regulations and/or ordinances result in higher default risk or lower recoveries of the securitized assets? | N | N |
| | | Are there potential benefits of GHG-efficient assets on affordability, financeability, regulatory compliance, or future values (recoveries)? | N | N |
| | | Carbon and GHG Costs | N | N |
| | Climate and Weather Risks | Are the securitized assets in regions exposed to climate change and adverse weather events affecting expected default rates, future valuations, and/or recoveries, considering key IPCC climate scenarios up to a 2°C rise in temperature by 2050? | N | N |
| | Passed-through Environmental credit considerations | Does this rating depend to a large extent on the creditworthiness of another rated issuer which is impacted by environmental factors (see respective ESG checklist for such issuer)? | N | N |
| Social | | Overall: | N | N |
| | Social Impact of Products and Services | Do the securitized assets have an extraordinarily positive or negative social impact on the borrowers and/or society, and do these characteristics of these assets result in different default rates and/or recovery expectations? | N | N |
| | | Does the business model or the underlying borrower(s) have an extraordinarily positive or negative effect on their stakeholders and/or society, and does this result in different default rates and/or recovery expectations? | N | N |
| | | Considering changes in consumer behavior or secular social trends: does this affect the default and/or loss expectations for the securitized assets? | N | N |
| | | Social Impact of Products and Services | N | N |
| | Human Capital and Human Rights | Are the originator, servicer, or underlying borrower(s) exposed to staffing risks and could this have a financial or operational effect on the structured finance issuer? | N | N |
| | | Is there unmitigated compliance risk due to mis-selling, lending practices, or work-out procedures that could result in higher default risk and/or lower recovery expectations for the securitized assets? | N | N |
| | | Human Capital and Human Rights | N | N |
| | Product Governance | Does the originator's, servicer's, or underlying borrower(s)' failure to deliver quality products and services cause damage that may result in higher default risk and/or lower recovery expectations for the securitized assets? | N | N |
| | Data Privacy and Security | Does the originator's, servicer's, or underlying borrower(s)' misuse or negligence in maintaining private client or stakeholder data result in financial penalties or losses to the issuer? | N | N |
| | Passed-through Social credit considerations | Does this rating depend to a large extent on the creditworthiness of another rated issuer which is impacted by social factors (see respective ESG checklist for such issuer)? | N | N |
| Governance | | Overall: | N | N |
| | Corporate / Transaction Governance | Does the transaction structure affect the assessment of the credit risk posed to investors due to a lack of appropriate independence of the issuer from the originator and/or other transaction parties? | N | N |
| | | Considering the alignment of interest between the transaction parties and noteholders: does this affect the assessment of credit risk posed to investors because the alignment of interest is inferior or superior to comparable transactions in the sector? | N | N |
| | | Does the lack of appropriately defined mechanisms in the structure on how to deal with future events affect the assessment of credit risk posed to investors? | N | N |
| | | Considering how the transaction structure provides for timely and appropriate performance and asset reporting: does this affect the assessment of credit risk posed to investors because it is inferior or superior to comparable transactions in the sector? | N | N |
| | | Corporate / Transaction Governance | N | N |
| | Passed-through Governance credit considerations | Does this rating depend to a large extent on the creditworthiness of another rated issuer which is impacted by governance factors (see respective ESG checklist for such issuer)? | N | N |
| | | Consolidated ESG Criteria Output: | N | N |

* A Relevant Effect means that the impact of the applicable ESG risk factor has not changed the rating or rating trend on the issuer.
A Significant Effect means that the impact of the applicable ESG risk factor has changed the rating or trend on the issuer.

## ESG Considerations

### Environmental

There were no environmental factors that had a relevant or significant effect on the credit analysis. For more details about which environmental factors could have an effect on the credit analysis, please refer to the checklist above.

### Social

There were no social factors that had a relevant or significant effect on the credit analysis. For more details about which social factors could have an effect on the credit analysis, please refer to the checklist above.

### Governance

There were no governance factors that had a relevant or significant effect on the credit analysis. For more details about which governance factors could have an effect on the credit analysis, please refer to the checklist above.

The above ESG discussion relates to credit risk factors that could affect the Issuer's credit profile and, therefore, the ratings of the certificates. They are separate from ESG sustainability factors, which are generally outside the scope of this analysis. A description of how Morningstar DBRS considers ESG factors within the Morningstar DBRS analytical framework can be found in the *Morningstar DBRS Criteria: Approach to Environmental, Social, and Governance Risk Factors in Credit Ratings* at https://dbrs.morningstar.com/research/427030.

# Appendix C: Scope and Meaning of Financial Obligations

Morningstar DBRS' credit ratings on the Notes address the credit risk associated with the identified financial obligations in accordance with the relevant transaction documents. For information on the associated financial obligations, please refer to the corresponding press release published for this credit rating action.

Note:
All figures are in U.S. dollars unless otherwise noted.

**About Morningstar DBRS**

Morningstar DBRS is a full-service global credit ratings business with approximately 700 employees around the world. We're a market leader in Canada, and in multiple asset classes across the U.S. and Europe.

We rate more than 4,000 issuers and nearly 60,000 securities worldwide, providing independent credit ratings for financial institutions, corporate and sovereign entities, and structured finance products and instruments. Market innovators choose to work with us because of our agility, transparency, and tech-forward approach.

Morningstar DBRS is empowering investor success as the go-to source for independent credit ratings. And we are bringing transparency, responsiveness, and leading-edge technology to the industry.

That's why Morningstar DBRS is the next generation of credit ratings.

Learn more at dbrsmorningstar.com.

MORNINGSTAR | DBRS

The Morningstar DBRS group of companies consists of DBRS, Inc. (Delaware, U.S.)(NRSRO, DRO affiliate); DBRS Limited (Ontario, Canada)(DRO, NRSRO affiliate); DBRS Ratings GMBH (Frankfurt, Germany) (EU CRA, NRSRO affiliate, DRO affiliate); and DBRS Ratings Limited (England and Wales)(UK CRA, NRSRO affiliate, DRO affiliate). Morningstar DBRS does not hold an Australian financial services license. Morningstar DBRS credit ratings, and other types of credit opinions and reports, are not intended for Australian residents or entities. Morningstar DBRS does not authorize their distribution to Australian resident individuals or entities, and accepts no responsibility or liability whatsoever for the actions of third parties in this respect. For more information on regulatory registrations, recognitions and approvals of the Morningstar DBRS group of companies please see: https://dbrs.morningstar.com/research/highlights.pdf.

The Morningstar DBRS Group of companies are wholly-owned subsidiaries of Morningstar, Inc.

© 2024 Morningstar DBRS. All Rights Reserved. The information upon which Morningstar DBRS credit ratings and other types of credit opinions and reports are based is obtained by Morningstar DBRS from sources Morningstar DBRS believes to be reliable. Morningstar DBRS does not audit the information it receives in connection with the analytical process, and it does not and cannot independently verify that information in every instance. The extent of any factual investigation or independent verification depends on facts and circumstances. Morningstar DBRS credit ratings, other types of credit opinions, reports and any other information provided by Morningstar DBRS are provided "as is" and without representation or warranty of any kind and Morningstar DBRS assumes no obligation to update any such credit ratings, opinions, reports or other information. Morningstar DBRS hereby disclaims any representation or warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability, fitness for any particular purpose or non-infringement of any of such information. In no event shall Morningstar DBRS or its directors, officers, employees, independent contractors, agents, affiliates and representatives (collectively, Morningstar DBRS Representatives) be liable (1) for any inaccuracy, delay, loss of data, interruption in service, error or omission or for any damages resulting therefrom, or (2) for any direct, indirect, incidental, special, compensatory or consequential damages arising from any use of credit ratings, other types of credit opinions and reports or arising from any error (negligent or otherwise) or other circumstance or contingency within or outside the control of Morningstar DBRS or any Morningstar DBRS Representative, in connection with or related to obtaining, collecting, compiling, analyzing, interpreting, communicating, publishing or delivering any such information. IN ANY EVENT, TO THE EXTENT PERMITTED BY LAW, THE AGGREGATE LIABILITY OF MORNINGSTAR DBRS AND THE MORNINGSTAR DBRS REPRESENTATIVES FOR ANY REASON WHATSOEVER SHALL NOT EXCEED THE GREATER OF (A) THE TOTAL AMOUNT PAID BY THE USER FOR SERVICES PROVIDED BY MORNINGSTAR DBRS DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO LIABILITY, AND (B) U.S. $100. Morningstar DBRS does not act as a fiduciary or an investment advisor. Morningstar DBRS does not provide investment, financial or other advice. Credit ratings, other types of credit opinions and other analysis and research issued by Morningstar DBRS (a) are, and must be construed solely as, statements of opinion and not statements of fact as to credit worthiness, investment, financial or other advice or recommendations to purchase, sell or hold any securities; (b) do not take into account your personal objectives, financial situations or needs; (c) should be weighed, if at all, solely as one factor in any investment or credit decision; (d) are not intended for use by retail investors; and (e) address only credit risk and do not address other investment risks, such as liquidity risk or market volatility risk. Accordingly, credit ratings, other types of credit opinions and other analysis and research issued by Morningstar DBRS are not a substitute for due care and the study and evaluation of each investment decision, security or credit that one may consider making, purchasing, holding, selling, or providing, as applicable. A report with respect to a Morningstar DBRS credit rating or other credit opinion is neither a prospectus nor a substitute for the information assembled, verified and presented to investors by the issuer and its agents in connection with the sale of the securities. Morningstar DBRS may receive compensation for its credit ratings and other credit opinions from, among others, issuers, insurers, guarantors and/or underwriters of debt securities. This publication may not be reproduced, retransmitted or distributed in any form without the prior written consent of Morningstar DBRS. ALL MORNINGSTAR DBRS CREDIT RATINGS AND OTHER TYPES OF CREDIT OPINIONS ARE SUBJECT TO DEFINITIONS, LIMITATIONS, POLICIES AND METHODOLOGIES THAT ARE AVAILABLE ON HTTPS://DBRS.MORNINGSTAR.COM. Users may, through hypertext or other computer links, gain access to or from websites operated by persons other than Morningstar DBRS. Such hyperlinks or other computer links are provided for convenience only. Morningstar DBRS does not endorse the content, the operator or operations of third party websites. Morningstar DBRS is not responsible for the content or operation of such third party websites and Morningstar DBRS shall have no liability to you or any other person or entity for the use of third party websites.